## PRUDENT REAL ESTATE TRUST, Appellant,

v.

## JOHNCAMP REALTY, INC., et al., Appellees.

### No. 1009, Docket 79–7215.

United States Court of Appeals, Second Circuit.

Argued April 4, 1979.

Decided April 12, 1979.

Before MOORE, FRIENDLY and MES-KILL, Circuit Judges.

FRIENDLY, Circuit Judge:

On March 28, 1979, we heard a motion by appellant Prudent Real Estate Trust (Prudent), the target of a tender offer by the defendant Johncamp Realty, Inc. (Johncamp), for an injunction pending appeal from an order of the District Court for the Southern District of New York, which had denied Prudent's motion for a temporary injunction against the continuation of a tender offer on the ground that the material filed with the Securities and Exchange Commission (SEC) pursuant to 17 C.F.R. § 240.14d–100 implementing § 14(d) of the Securities and Exchange Act was insufficient and that, because of certain statements and omissions, the offer violated § 14(e) of the Act. We granted the motion until argument of an expedited appeal on April 4, and then extended the injunction pending decision. We now reverse and instruct the district court to issue an appropriate temporary injunction.

Prudent is a New York business trust whose shares are traded on the American Stock Exchange, which has qualified as a real estate investment trust under §§ 856–859 of the Internal Revenue Code. It now has six trustees, only two of whom receive substantial compensation. Defendant Johncamp is a Delaware close corporation which was founded by Johncamp Netherlands Antilles, N.V. (Johncamp N.V.) and The Pacific Company, a California corporation (Pacific). Johncamp N.V. owns 60% and Pacific 40% of the common shares of Johncamp. All of the stock of Johncamp N.V. is owned by Campeau Corporation (Campeau), a publicly held Ontario corporation; Robert Campeau, a resident of Canada, is chairman of its board and chief executive officer. John E. Wertin, a resident of California, is president, secretary and a director of Johncamp, president and a director and sole stockholder of Pacific, and president and director of John Wertin Development Corporation (JWDC), a Califor-

Harry I. Rand, New York City (Botein, Hays, Sklar & Herzberg, Stanley M. Kolber, and Lawrence M. Kaye, New York City, of counsel), for appellant.

Richard C. Tufaro, New York City (Milbank, Tweed, Hadley & McCloy, Harry L. Simmons, Charles E. Dropkin, Sarah Lichtenstein, Michael L. Michael, and Edward G. Williams, New York City, of counsel), for appellees.

nia corporation, 95% of the stock of which is owned by Pacific. Johncamp, Pacific and JWDC have their principal places of business at the same address in Irvine, California; Johncamp N.V. and Campeau have their principal places of business at the same address in Ottawa. In an elaborate stockholders' agreement dated March 12, 1979, Johncamp N.V. and Pacific contracted that in order to enable Johncamp to make the tender offer for shares of Prudent, Johncamp N.V. would invest up to $20,000,-000 and Pacific up to $5,000,000 in Johncamp preferred shares. The agreement also provided that subsequent to Johncamp's acquisition of Prudent shares, Pacific should have exclusive control of the voting of such shares and, with an exception not here material, management of any property received in respect of such shares including the right to dispose of such property for cash; all other matters relating to the management of Johncamp would be controlled jointly by Johncamp N.V. and Pacific. The parties would also cause Johncamp to retain Pacific "as an independent contractor responsible for supervising implementation of decisions of the parties with respect to the management and operation" of Johncamp. Another agreement between Campeau, Johncamp N.V., Pacific, Wertin and Johncamp related to further details connected with the tender offer. Wertin and JWDC guaranteed to Campeau and Johncamp N.V. the performance by Pacific of certain covenants in the agreements.

On March 12, 1979, Johncamp filed with the SEC a Schedule 14 D–1 as required for a tender offer by 17 C.F.R. § 240.14d–100. The schedule contained the form of offer, which was advertised the following day in the New York Times. The offer, which was to expire on March 23 unless extended, was to purchase any and all of Prudent's outstanding shares at $7 net per share, as against the last available market price of 4⅞, and was not conditioned upon any minimum number of shares being tendered. In addition to usual warnings of such possible consequences of the offer as delisting on the American Stock Exchange, cessation of

qualification as margin securities, and termination of registration under the Securities Exchange Act, the offer had this to say with respect to the possible effect on REIT status:

If the Purchaser acquires all of the Shares of the Company, the Company will not qualify as a real estate investment trust for its taxable year ending November 30, 1979. Moreover, even if the Purchaser acquires less than all of the Shares of the Company, it is possible that the Company will not qualify as a real estate investment trust for any taxable year if, as a result of the Offer or any other transactions not related to the Offer: (1) fewer than 100 persons beneficially own Shares of the Company during at least 31 days of such taxable year or (2) more than 50 percent in value of the Shares is owned (directly or indirectly under the provisions of Section 544 of the Internal Revenue Code of 1954, as amended) at any time during the last half of any such taxable year by or for not more than 5 individuals.

If the Company's qualification as a real estate investment trust is terminated as a result of the above-described rules or for any other reason, the Company will not be eligible to elect to be treated as a real estate investment trust until the fifth taxable year after the termination is effective unless the Company establishes to the satisfaction of the Internal Revenue Service that its failure to qualify as a real estate investment trust was due to reasonable cause and not due to willful neglect.

For any year in which the Company does not qualify as a real estate investment trust, it will be subject to Federal, State and local taxation as a corporation and will not be entitled to the favorable tax treatment accorded qualified real estate investment trusts and distributions to its shareholders would not be deductible by the Company in computing its taxable income.

The offer went on to state that 80% of the required funds would be furnished by

Johncamp N.V. which would obtain them from Campeau, out of the latter's own funds or from a $50,000,000 (Canadian) line of bank credit described in some detail, and that 20% would be supplied by Pacific which would obtain the funds from JWDC and Wertin. The purpose of the offer was to acquire all the shares of Prudent but if this did not occur pursuant to the offer, Johncamp, Campeau, Johncamp N.V. and Pacific desired to acquire enough shares to exercise control. The purchaser intended to reconstitute the board of trustees of Prudent as soon and as much as possible. Although no specific plans for Prudent's future had been formulated, Johncamp N.V. and Pacific had established a procedure to increase the likelihood that Campeau's investment in Johncamp would be fully recovered; pursuant to such procedure Johncamp N.V. could cause a liquidation of Prudent if Johncamp acquired at least two-thirds of the outstanding shares. The offer continued:

> Implementation of any plans resulting from a review of the Company would require approval of the Board of Trustees and, if required by the Declaration of Trust, the approval of shareholders. The Declaration of Trust provides that the Trustees shall not sell all or substantially all of the assets of the Company without the affirmative vote of not less than a majority in interest of the Shares then outstanding and entitled to vote, nor can there be a termination of the Company without the affirmative vote of not less than two-thirds in interest of the Shares then outstanding and entitled to vote.

The only other portion of the Schedule 14 D here relevant is *Item 9. Financial Statements of Certain Bidders.* This was answered: "Not applicable, but see Exhibit 1." Exhibit 1 consisted of the printed annual reports of Campeau for 1976 and 1977 and audited consolidated financial statements for 1978.

On March 16, 1979, Prudent initiated this action to enjoin the defendants from proceeding with the tender offer and moved for a temporary restraining order and a preliminary injunction on various grounds. One of these, not pressed on this appeal but reserved for future presentation in the district court after further discovery, is that there is a secret undisclosed plan to liquidate Prudent. The three points urged below which continue to be pressed here are the failure to disclose in the Offer or the Schedule any financial information about the Wertin interests, to wit, Pacific, JWDC, and Wertin himself, as 17 C.F.R. § 240.14d–100, Item 9, allegedly requires; the claimed inadequacy of the discussion of the effects of loss of REIT status; and the falsity of the statement that Prudent could be terminated only by a vote of two-thirds of the outstanding shares when Prudent's declaration of trust also allowed this to be done by the board of trustees acting alone.

At a hearing on March 16, at which Judge Owen declined to issue a temporary restraining order, Johncamp's counsel stated that, although Johncamp did not believe the erroneous statement with respect to termination of Prudent to be material, it was considering correction of that statement by amendment of the offering documents. At a further hearing counsel announced that it was filing a correcting amendment with the SEC and would issue a press release to that effect. However, the amendment was not advertised in the New York Times and, so far as appears, the press release has not been reported; Johncamp was unable to transmit it to Prudent shareholders because of Prudent's refusal to make the shareholders' list available—a subject being litigated in the New York courts. The judge set the preliminary injunction motion for argument on March 21 and directed that Wertin and W. J. Carroll, Campeau's chief financial officer, be deposed on March 20.

On March 23 the district judge denied the motion for a temporary injunction. After rejecting Prudent's claim of a secret intent by Johncamp to liquidate, he concluded that the error with respect to the termination of Prudent was immaterial and in any event had been cured and that the disclosure as to the effect of REIT status was adequate.

Doubtless because of the speed with which the proceedings had to be conducted, he did not discuss the most important, and certainly the most interesting, of Prudent's claims—the failure to disclose any financial information in regard to the Wertin interests. In deciding whether the financial condition of the Wertin interests was material, we must now give appropriate weight to the issuance of Schedule 14 D–1 effected by the release reported in 42 F.R. 38341 (July 28, 1977).

The relevant sections of the Securities Exchange Act, § 14(d)(1) and (e), added by the Williams Act of 1968, are too familiar to require extended exposition. It is sufficient here to say that in a case like this § 14(d)(1) prohibits the making of a tender offer by any person "unless at the time copies of the offer or request or invitation are first published or sent or given to security holders, such person has filed with the Commission a statement containing such of the information specified in section 13(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors", and that "[a]ll requests, or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe." Section 14(e) makes it unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ." The House Interstate and Foreign Commerce Committee explained the need for the new legislation as follows:

> Where one company seeks control of another by means of a stock-for-stock exchange, the offer must be registered under the Securities Act of 1933. The shareholder gets a prospectus setting forth all material facts about the offer.

He knows who the purchaser is, and what plans have been made for the company. He is thus placed in a position to make an informed decision whether to hold his stock or to exchange it for the stock of the other company.

\*  \*  \*  \*  \*  \*

> In contrast when a cash tender offer is made, no information need be filed or disclosed to shareholders. Such an offer can be made on the most minimal disclosure; yet the investment decision— whether to retain the security or sell it— is in substance little different from the decision made on an original purchase of a security, or on an offer to exchange one security for another.

\*  \*  \*  \*  \*  \*

> The persons seeking control . . . have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision. H.Rep. No. 1711, 90th Cong., 2d Sess., reprinted in 2 U.S.Code Cong. & Admin.News pp. 2811, 2812–13 (1968).

This discussion reflected views earlier expressed by the late Manuel F. Cohen, Chairman of the SEC, in A Note on Takeover Bids and Corporate Purchases of Stock, 22 Bus.Law 149, 149–50 (1966). See also Sen. Rep. No. 539, 90th Cong., 1st Sess., at 2 and 3.

Faced with the need of quickly issuing regulations the SEC responded with a set of emergency rules, 33 F.R. 11015. These made no express requirement for revelation of the financial condition of the offeror. In November and December 1974 the SEC conducted Tender Offer Hearings; these led to the publication of proposed § 14(d) regulations on August 6, 1976, 41 F.R. 33004.

Meanwhile cases presenting the question whether the maker of a cash offer must furnish information about its financial position were beginning to reach the courts. Since Schedule 14 D had not yet been for-

mulated, plaintiffs had to take the harder road of asserting that failure to furnish such information constituted a violation of § 14(e). The first case was *Corenco Corp. v. Schiavone & Sons, Inc.,* 362 F.Supp. 939, 948–50 (S.D.N.Y.1973). Judge Ward held that § 14(e) required the offeror, Schiavone & Sons, Inc., to provide enough information about itself to enable a Corenco shareholder ·to make an informed decision.[1] Schiavone did not appeal; Corenco appealed from a later order which allowed Schiavone to proceed with the offer once the necessary information was supplied. This court affirmed, 488 F.2d 207, 214–16 (1973). Although both sides endeavor to extract crumbs from Judge Mansfield's opinion, we deem the endeavor futile, since, as the opinion clearly stated, the issue whether the district court had been correct in compelling Schiavone to furnish information was not before it. Next came *Alaska Interstate Company v. McMillian,* 402 F.Supp. 532, 546–49 (D.Del.1975), a case of exceeding complexity. Judge Stapleton framed the issue as being whether "the Williams Act is violated whenever one who tenders for less than all of the stock and proposes an acquisition of the target corporation for its own securities fails to provide its financials in the tender materials." In answering that question in the negative he stressed the large amount of financial information about the offeror that was readily available and the fact that the SEC had not yet required disclosure when the offer was in cash rather than securities of the offeror. Finally, in *Copperweld Corporation v. Imetal,* 403 F.Supp. 579, 598–602 (W.D.Pa.1975), Judge Miller stated that he was "inclined to agree with Copperweld [the target] that, *under appropriate circumstances,* financials can be required under Section 14(e)" (emphasis in original), but held that the reports filed by a French offeror were sufficient although they did not conform to SEC Reg-

ulation S–X but had been prepared in accordance with French requirements.[2]

Meanwhile, the SEC's rulemaking had been proceeding and in a release appearing on July 28, 1977, 42 F.R. 38341–50 new regulations were issued, which for the first time adopted a schedule 14 D, specifically tailored to § 14(d) of the Act. The schedule included as Item 9, 42 F.R. 38349:

*Item 9. Financial Statements of Certain Bidders.* Where the bidder is other than a natural person and the bidder's financial condition is material to a decision by a security holder of the ·subject company whether to sell, tender or hold securities being sought in the tender offer, furnish current, adequate financial information concerning the bidder, *Provided,* That if the bidder is controlled by another entity which is not a natural person and has been formed for the purpose of making the tender offer, furnish current, adequate financial information concerning such parent.

*Instructions.* 1. The facts and circumstances concerning the tender offer, particularly the terms of the tender offer, may influence a determination as to whether disclosure of financial information is material. However, once the materiality requirement is applicable, the adequacy of the financial information will depend primarily on the nature of the bidder.

In order to provide guidance in making this determination, the following types of financial information will be deemed adequate for purposes of this item for the type of bidder specified: (a) Financial statements prepared in compliance with Form 10 as amended [§ 249.210 of this chapter] for a domestic bidder which is otherwise eligible to use such form; and (b) financial statements prepared in compliance with Form 20 [§ 249.200 of this chapter] for a foreign bidder which is otherwise eligible to use such form.

---

**1.** Judge Ward found the following factors to be relevant, 362 F.Supp. at 950:

> (1) no financial information concerning Schiavone is available; (2) Schiavone seeks control; (3) Schiavone contemplates a merger; and (4) less than all shares are sought.

**2.** The court also put weight on the fact that Schiavone's offer in *Corenco* had been for less than a third of the shares whereas Imetal offered to purchase all.

2. If the bidder is subject to the periodic reporting requirements of sections 13(a) or 15(d) of the Act, financial statements contained in any document filed with the Commission may be incorporated by reference in this schedule solely for the purposes of this schedule; *Provided,* That such financial statements substantially meet the requirements of this item; an express statement is made that such financial statements are incorporated by reference; the matter incorporated by reference is clearly identified by page, paragraph, caption or otherwise; and an indication is made where such information may be inspected and copies obtained. Financial statements which are required to be presented in comparative form for two or more fiscal years or periods shall not be incorporated by reference unless the material incorporated by reference includes the entire period for which the comparative data is required to be given.

3. If the bidder is not subject to the periodic reporting requirements of the Act, the financial statements required by this item need not be audited if such audited financial statements are not available or obtainable without unreasonable cost or expense and a statement is made to that effect disclosing the reasons therefor.

Explaining Item 9, the SEC pointed out that its initial proposal had required the bidder's financials "if an average, prudent investor ought reasonably to be informed of such information in deciding whether to tender, sell or hold securities sought in the tender offer," that commentators had "expressed concern about the materiality test and the original requirement of compliance with Form 10," and that several changes had been made in response. Emphasizing that Item 9 retained the concept of materiality and that this was dependent on the facts and circumstances, the Commission said, 42 F.R. at 38346:

These may include, but are not limited to: (1) the terms of the tender offer, particularly those terms concerning the amount of securities being sought, such as any or all, a fixed minimum with the right to accept additional shares tendered, all or none, and a fixed percentage of the outstanding; (2) whether the purpose of the tender offer is for control of the subject company; (3) the plans or proposals of the bidder described in Item 5 of the Schedule; and (4) the ability of the bidder to pay for the securities sought in the tender offer and/or to repay any loans made by the bidder or its affiliates in connection with the tender offer or otherwise. It should be noted that the factors described above are not exclusive nor is it necessary that any or all such factors be present in order to trigger the materiality test.

It stressed also that the rigor of the requested financial reporting had been abated. While Forms 10 and 20 constituted "safe harbors", a bidder not subject to the reporting requirements of the Act could provide even unaudited financial statements if audited statements were not available or obtainable without unreasonable cost or expense. The Commission took specific note of the *Corenco* case.

The parties accept that the test of materiality is that stated in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), although that case arose under Rule 14a–9 concerning proxy contests. The Court there opted for a test lying between the Seventh Circuit's formulation there under review, " 'all facts which a reasonable shareholder might consider important,' " and the more stringent tests enunciated by us in *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 162 (1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969) and *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1301–02 (1973) and the Fifth Circuit in *John R. Lewis, Inc. v. Newman,* 446 F.2d 800, 804 (1971) and *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 603–04 (1974). The Court's formulation was, 426 U.S. at 449, 96 S.Ct. at 2132:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

The Court made the further pertinent comment:

> It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

In applying this test to a cash tender offer, it is necessary to appreciate the problem faced by a stockholder of the target company in deciding whether to tender, to sell or to hold part or all of his securities. It is true that, in the case of an "any and all" offer such as that here at issue, a stockholder who has firmly decided to tender has no interest in the financial position of the offeror other than its ability to pay—a point not here at issue—since he will have severed all financial connections with the target. It is also true that in the case of such an offer, there is less reason for him to seek to eliminate the risk of being partly in and partly out by selling to arbitrageurs, usually at a price somewhere between the previous market and the offered price, than where the offer is for a stated number or percentage of the shares (with or without the right to accept additional shares) or is conditioned on a minimum number being obtained. Still, the shareholder of the target company faces a hard problem in determining the most advantageous course of action, a problem whose difficulty is enhanced by his usual ignorance of the course other shareholders are adopting. If the bidder is in a flourishing financial condition, the stockholder might decide to hold his shares in the hope that, if the offer was only partially successful, the bidder might raise its bid after termination of the·offer or infuse new capital into the enterprise. *Per contra,* a poor financial condition of the bidder might cause the shareholder to accept for fear that control of the company would pass into irresponsible hands. The force of these considerations is diminished but not altogether removed in this case by the fact that the Wertin interests were supplying only 20% of the financing and that Campeau's annual reports for 1976 and 1977 and its financial statements for 1978, which were incorporated in the Schedule 14 D, showed it to be a company of substance. As against this, the stockholders' agreement gave Wertin the right to vote all acquired Prudent shares and the district court found that Wertin was to manage the properties. The case came within item (2) and possibly item (3) of the SEC's release, 42 F.R. 38346.

Johncamp relies on statements by SEC Chairman Cohen before the House Committee at the hearings that led to the Williams Act wherein he analogized the information required by the bill to be provided to stockholders with that required in proxy contests, where Regulation 14 A does not require a challenger to file its financial statements unless it proposes a merger or consolidation or the issuance "of securities of another issuer", even if its objective is to gain control.[3] Prudent counters with the language from the House Committee report quoted above, echoing Chairman Cohen's article, that in the case of a cash tender offer "the investment decision—whether to retain the security or sell it—is in substance little different from the decision made on an original purchase of a security, or on an offer to exchange one security for another." See to the same effect Sen.Rep. No. 550, 90th Cong., 1st Sess. at 3. In truth the

---

**3.** However, Item 15(c) of Schedule 14 A provides:

> The Commission may also require the filing of other statements in addition to, or in substitution for, the statements herein required in any case where such statements are necessary or appropriate for an adequate presentation of the financial condition of any person whose financial statements are required, or whose statements are otherwise material for the exercise of prudent judgment in regard to any matter to be acted upon.

situation is not precisely like any of these models. It differs from the proxy contest *simpliciter* in that an investment decision is being made; it differs from an original purchase of a security or an offer to exchange one security for another in that the stockholder does not have to appraise what he is buying. It differs also from an ordinary sale in that the investment decision is influenced not solely by general factors affecting the prospects of the economy, the market, or the company, but importantly by the particular proposal being made. In any event we must look to some extent to what the Congressional committees said rather than to what the facts are.

■ From the beginning of litigation under the Williams Act, this court has been conscious of its responsibility not to allow management to "resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers." *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (1969); see also *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 854, 873, *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). However, the issue raised by this appeal seems to us to be one where it does matter that the test of materiality is not the more severe one we proposed in *General Time* and *Gamble-Skogmo, supra,* but the standard fashioned by the Supreme Court in 1976, "substantial likelihood that . . . disclosure of the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 449, 96 S.Ct. at 2132. An important factor here is the impracticability of obtaining information about the Wertin interests from other sources. See Aranow, Einhorn, & Berlstein, Developments in Tender Offers for Corporate Control, at 61 (1977). At the very least there is "fair ground for litigating" the issue of materiality and the balance of hardships tips heavily in Prudent's favor. *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2 Cir. 1953). We are further influenced by the fact that our decision imposes no serious impediment to cash tender offers. Even in this case the omis-

sion can be readily corrected; in future cases presumably it will not be made, see *Corenco, supra,* 488 F.2d at 214.

■ We think also that the acknowledged error in stating that Prudent's existence could be terminated only by a vote of two-thirds of the outstanding shares when the declaration of trust also allowed this to be done by a unanimous board of trustees was material. It was quite possible that Johncamp might acquire enough stock to name all new trustees although having less than two-thirds of the outstanding shares. We are not required to determine whether knowledge of the more immediate prospect of Prudent's termination would cause a stockholder to be less or more willing to tender; it was knowledge he was entitled to have. We also cannot agree that issuance of a press release which was not published anywhere was an adequate correction.

■ Prudent points to two omissions in the offer's discussion of the effect of loss of REIT status under the Internal Revenue Code as a result of too large a concentration of ownership in Johncamp. One concerns the ability of a REIT to declare "capital gains dividends", IRC § 857(b)(3); the other is the requirement that in order to retain REIT status the trust must pay out 90% (95% in taxable years beginning on or after January 1, 1980) of taxable operating income as dividends, IRC § 857(a)—an incentive that would no longer exist if REIT status had been lost in any event. It is not a sufficient answer that Prudent's primary interest was in holding real estate rather than in selling it, or that Prudent had suffered losses in recent years. Unlike the district court, we see no meaningful distinction between this case and *Commonwealth Oil Refining Co., Inc. v. Tesoro Petroleum Corp.,* 394 F.Supp. 267, 278 (S.D.N.Y.1975), a decision by Judge Cannella with which we broadly agree. See also *Joyce v. Joyce Beverages, Inc.,* 571 F.2d 703 (2 Cir. 1978) (complaint under Rule 10b–5 alleging incorrectness of one and incompleteness of another statement of legal consequence of a consolidation should not have been dismissed under F.R.Civ.P. 12(b)(6)). However, we do not believe Johncamp was obliged to at-

tempt to quantify the effect of loss of REIT status.

We therefore reverse the order under appeal and direct the district court to issue a temporary injunction. It will be sufficient if this extends only until Johncamp makes the necessary corrections and allows a reasonable period for withdrawal of stock already tendered; we see no need for the further cooling-off period that Prudent requests. While, as a general matter, the need for filing information on the financial condition of a bidder is not quite such a *res nova* as it was before the district court decision in *Corenco,* see 488 F.2d at 214–15, the applicability of Item 9 of Schedule 14 D in a situation like this was far from clear. The other two infirmities we have found seem to have been inadvertent and not at all "deliberate violations of the Williams Act," *id.* Since Prudent conceded that its only reason for declining to make its stockholder list available to Johncamp was the alleged defects in the offer and Schedule 14 D, the order should direct that this be done once the corrections are made if litigation in the New York courts has not yet produced that result.

Our injunction pending appeal will remain in force until a temporary injunction is issued by the district court. The mandate shall issue forthwith.