860 F.2d 60
 57 USLW 2304, Fed. Sec. L. Rep. P 94,065
 CITY CAPITAL ASSOCIATES LIMITED PARTNERSHIP, Cardinal
Holdings Corp. and Cardinal Acquisition Corp.
v.
INTERCO INCORPORATED, a Delaware Corporation, Harvey
Saligman, Richard B. Loynd, R. Stuart Moore, Charles J.
Rothschild, Jr., Ronald L. Aylward, Donald E. Lasater, Harry
M. Krogh, Lee Lieberman, Mark H. Lieberman, Robert H.
Quenon, William E. Cornelius, Marilyn S. Lewis and Thomas H.
O'Leary, and Charles M. Oberly, III, Attorney General of the
State of Delaware, and Michael E. Harkins, Secretary of
State of Delaware.
INTERCO INCORPORATED, Counterclaimant and Third Party Plaintiff,
v.
CARDINAL ACQUISITION CORP., Cardinal Holdings Corp., City
Capital Associates Limited Partnership,
Counterclaim Defendants,
and
Steven M. Rales, Mitchell P. Rales, City GP I, Inc., City GP
II, Inc., ASM Group, Inc., and Arthur M. Bylin,
Third Party Defendants.
Appeal of INTERCO INCORPORATED, a Delaware corporation
("Interco"), Counterclaimant and Third Party Plaintiff.
 No. 88-3645.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 11, 1988.
Decided Oct. 20, 1988.
Rehearing and Rehearing In Banc and
Application for
Injunction Denied
Nov. 1, 1988.
 
 John Michael Clear, Terrence J. O'Toole, J. Thomas Archer, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Charles F. Richards, Jr., Thomas A. Beck, C. Stephen Bigler, Richards, Layton & Finger, Wilmington, Del., Steven M. Barna, Michael W. Schwartz (argued), Robert A. Ragazzo, Wachtell, Lipton, Rosen & Katz, New York City, for Interco Inc. et al.
 Rodman Ward, Jr., Jay B. Kasner, Charles L. Glick, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., Robert E. Zimet (argued), Skadden, Arps, Slate, Meagher & Flom, New York City, for counterclaim defendants and third party defendants appellees.
 Before GIBBONS, Chief Judge, and STAPLETON, and WEIS, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 This suit was instituted by City Capital Associates Limited Partnership (City Capital) seeking preliminary and permanent injunctive relief against Interco Incorporated (Interco), and certain Delaware officials to foreclose application of Section 203 of the General Corporation Law of Delaware, Del.Code Ann.Tit. 8, Sec. 203 (1987), to City Capital's tender offer for Interco stock. Interco counterclaimed alleging violations of the Williams Act. The district court denied Interco's motion for a preliminary injunction on its counterclaim, 696 F.Supp. 1551, and this appeal followed. The appeal raises only a single Williams Act issue.
 
 I.
 
 2
 Interco, formerly known as International Shoe Company, is a St. Louis business with total assets of approximately $2 billion and a shareholder's equity of $1.2 billion dollars. The company is listed on the New York and Midwest Stock Exchanges and has 36 million shares outstanding. City Capital is a partnership owned by two limited partners who each have a one (1%) percent interest and two general partners, City GP I, Inc. (City GP I) and City GP II, Inc. (City GP II) which each own forty-nine (49%) percent. Steven M. Rales is the sole stockholder of City GP I and his brother, Mitchell P. Rales, is the sole stockholder in City GP II. City Capital owns 100% of Cardinal Holdings Corporation (Holdings) which in turn owns 100% of Cardinal Acquisition Corp. (Acquisition), the entity that is making the tender offer for Interco stock. Acquisition was organized by City Capital as a vehicle for the acquisition of Interco stock.
 
 
 3
 On July 18, 1988, City Capital, City GP I, City GP II, Steven Rales and Mitchell Rales filed a Schedule 13D with the Securities and Exchange Commission advising that City Capital had acquired 8.10 percent of Interco stock. On July 27, 1988, City Capital proposed a friendly merger with Interco at $64 per share and on August 8, 1988, increased the offer to $70 per share. Interco's Board of Directors, maintaining that the company's shares were fairly valued at $76 each, rejected the merger offer. On August 15, 1988, Acquisition, Holdings, City Capital, City GP I, City GP II, Steven Rales and Mitchell Rales filed a Schedule 13D and a Schedule 14D-1 notifying the SEC of a hostile takeover bid for Interco shares to be made by Acquisition as the "bidder," at $70. This tender offer commenced on August 15, 1988. The bid price has since been increased to $72.
 
 
 4
 The tender materials disclose that $2.6 billion in financing will be required to consummate the tender offer. It is expected that $1.225 billion will be borrowed from a syndicate of banks led by Chase National Bank (Chase). Drexel Burnham Lambert, Inc. (Drexel) has been engaged to raise the remaining $1.375 billion through the sale of preferred securities of Acquisition. Acquisition's obligation to purchase tendered shares is conditioned, among other things, upon the tender of a sufficient number of shares which, when added to the Interco shares owned by City Capital, will constitute 75% of the outstanding Interco stock. If the tender is successful it is expected that Interco will be combined with Acquisition or one of its affiliates in a merger in which each share of Interco, other than shares owned by Acquisition or its affiliates or by Interco stockholders who have perfected their appraisal rights, will be cashed out for an amount equal to the price paid in the tender offer. While preferred and common stock of Acquisition will be issued in connection with the financing of the offer, City Capital will retain a minimum of 63% of the common stock of Acquisition, through Holdings or otherwise, and thus will remain in control of Acquisition.
 
 
 5
 The tender offer materials also disclose the consideration to be received by Drexel for its services as financial adviser and dealer manager. City Capital agreed to make available to Drexel or its designees between 29% and 36% of the common equity of Acquisition, depending upon the amount of preferred stock Drexel is asked to sell. The right to place the common equity was sought by Drexel so that it could offer common equity as a "sweetener" to prospective purchasers in order to encourage them to purchase the preferred securities that Drexel has undertaken to place. However, Drexel has the right to keep for itself up to one-half of the 36%. Drexel is under no obligation to purchase any equity interest in Acquisition.[1] In connection with the placement of the preferred stock, Drexel is also entitled to a $12 million fee if the takeover is successful and a $6 million fee if it is not. Further, Drexel is promised a 1.125% fee for funds for which it secures written commitments, and 3 percent to 5.25 percent of the total gross proceeds from the sale of debt or equity securities it underwrites. In addition, Drexel is to receive a $2 million fee for performing exclusive financial adviser services and is to receive $1 million for acting as dealer manager. Finally, Drexel has the right to 15% of profits the Rales brothers make in the event that acquired shares are sold following an unsuccessful takeover.
 
 
 6
 The tender offer materials further disclosed that Drexel has received subpoenas from a grand jury investigation in New York and is the subject of an impending SEC civil enforcement action.
 
 
 7
 On September 9, 1988, Interco filed a counterclaim alleging that the tender offer violated the Williams Act and the regulations thereunder in that (1) the tender materials failed to disclose that the proposed transaction would violate the margin requirements because the "preferred" stock is in reality debt, (2) those materials also failed to disclose that the transaction would violate the Hart-Scott Act, and (3) both Drexel and Chase were "bidders", as that concept is employed in the Williams Act regulations, and both had failed to make the filings and disclosures required of "bidders" under those regulations. Interco stockholders were advised of the filing of this counterclaim and of these contentions in supplemental tender offer materials.
 
 
 8
 Discovery concerning the tender offer, including depositions of the Drexel personnel involved in the tender, was conducted prior to the September 16, 1988 presentation of Interco's motion for a preliminary injunction to the district court and numerous affidavits, documentary exhibits and deposition excerpts were submitted supporting and opposing that motion. On September 23, 1988, the district court filed its opinion finding that Interco had failed to show a likelihood of success on any of its contentions. In particular, the district court concluded that neither Drexel nor Chase was a "bidder."
 
 
 9
 On October 3, 1988, Interco appealed from the order denying its motion for a preliminary injunction. We expedited consideration of the appeal and heard argument October 11, 1988. Before us, Interco contends only that Drexel is a "bidder" and that, accordingly, the tender offer has been made in violation of the applicable Williams Act regulations. 17 C.F.R. Sec. 240.14d-1 to Sec. 240.14d-101 (1987).
 
 II.
 
 10
 We agree with Interco that the Williams Act was intended to require one making a tender offer of the requisite size to disclose all information material to decisions about the tender offer. However, there is no dispute that in connection with the tender offer giving rise to this case, Acquisition, Holdings, City Capital, City GP I, City GP II, Steven M. Rales and Mitchell P. Rales filed a timely and complete Schedule 14D-1 as "reporting persons."[2] Despite Interco's access to the documents, employees, and agents of both these entities and Drexel, it has been unable to point to any material misrepresentation or material omission in these filings.[3] In particular, Interco can point to no material misrepresentation or omission about the role of Drexel in the proposed transaction. As a result, it is forced to argue that Drexel is a "bidder" as that term is used in the regulations adopted under Section 14D and that the Schedule 14D filing is deficient because it includes no Drexel financials. In support of this contention, Interco cites the evidence indicating that Drexel will be paid very substantial fees for services rendered in connection with the tender offer and will receive for itself and its designees the right to purchase between 29% and 36% of the common equity of the corporation that will purchase the tendered stock. In our view, the former evidence is irrelevant to the "bidder" issue and the latter is insufficient to make Drexel a "bidder."
 
 
 11
 The undisputed facts of record indicate that the Rales brothers decided to make a tender for Interco stock and, in fact, made an offer at $64 per share before engaging the services of Drexel.[4] While the Raleses subsequently enlisted Drexel's assistance and agreed to pay its substantial fees and grant it the above-referenced option, there is no indication that the Raleses relinquished to Drexel any control over the tender offer. Moreover, it is undisputed that City Capital will retain at least 63% of the common stock of the purchaser of the tendered shares and there is no evidence that Drexel is to have any role with respect to the purchaser other than that of an investor.[5] Accordingly, the legal issue presented is whether the filing by the Rales brothers and their related entities of a Schedule 14D, both complete and accurate from their perspective, satisfied the disclosure requirements of the Act or whether a person who will hold a minority investment position in the surviving entity must also file a similar schedule, viewing itself as an additional "bidder."
 
 
 12
 Before turning to this issue it is important to stress two considerations that must guide our analysis. First, the Securities and Exchange Commission has been entrusted by Congress with the interpretation, administration, and enforcement of the Securities Acts. As a result, we must defer to its interpretation of the Williams Act and the regulations thereunder unless we are prepared to say there is a conflict between those interpretations and the Congressional mandate. Securities & Exchange Commission v. Chenery Corporation, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Second, this is an area of the law in which predictability is of crucial importance. The regulations are provided for the guidance of those seeking to comply with the law and it would be a serious mistake to reach a result in this case of which the regulations do not give fair notice. Thus, we must be constrained by a fair reading of the text of the regulations even if we might reach a different result were we charged with the responsibility of promulgating regulations to implement the Williams Act.
 
 
 13
 The Williams Act mandates that persons intending to make certain tender offers disclose such information as the SEC directs. Under the regulations that implement this mandate, the required information is specified in the Schedule that constitutes a part of the regulations. 17 C.F.R. Secs. 240.14d-6(e); 240.14d-100. In spelling out the extent of the required disclosure, both the regulations and the Schedule use the word "bidder," a term not found in the Act itself. The regulations define "bidder" to mean "any person who makes a tender offer or on whose behalf a tender offer is made." Sec. 240.14d-1. Schedule 14D defines "bidder" to mean simply "any person on whose behalf a tender offer is made." Sec. 240.14d-100 General Instruction G. We acknowledge that either of these definitions could be interpreted, depending on its context, to include the stockholders of a corporation making an offer to buy securities of the "subject" or target company. In the context of the regulations and the Schedule, however, "bidder" is consistently used to describe the person or entity that will purchase the securities tendered. This is nowhere more apparent than in the part of Schedule 14D that imposes the disclosure requirement relied upon by Interco. Item 9 of Schedule 14D provides:
 
 
 14
 Where the bidder is other than a natural person and the bidder's financial condition is material to a decision by a security holder of the subject company whether to sell, tender or hold securities being sought in the tender offer, furnish current, adequate financial information concerning the bidder; Provided, That if the bidder is controlled by another entity which is not a natural person and has been formed for the purpose of making the tender offer, furnish current, adequate financial information concerning such parent.
 
 
 15
 The "proviso" of this Item makes it clear that the SEC does not understand "bidder" to include the stockholder of a corporation making a tender offer even when that corporation has been formed for the sole purpose of making the offer. Moreover, Item 9 reveals that the Commission has focused on precisely the issue we here confront, i.e., when should financials of someone other than the one making the bid and intending to purchase the securities be required. The answer provided by the Commission for a situation of the kind before us is that the entity controlling the "bidder" must provide financial information whenever that information would be "material to a decision by a security holder of the subject company."
 
 
 16
 The Schedule addresses similar issues with respect to other information, makes similar distinctions between the "bidder" and others associated with the "bidder," and provides similar answers. Item 10, for example, requires disclosure not only of any material "contracts, arrangements or understandings" between the "bidder" and the subject company, but also of any such relationship between persons "controlling" the "bidder" and the subject company. Indeed, General Instruction C of Schedule 14D requires that, unless otherwise specified, information relating to each "controlling person" must be provided in response to all Items.
 
 
 17
 The regulations and the Schedule simply do not communicate to any lawyer or layman attempting to comply with the law that financials are required from an entity that ultimately will be a minority stockholder in a corporation making a tender offer. Indeed, the regulations and the Schedule fairly read send exactly the opposite message and the message they do send is precisely the message one reading them would expect. Where a stockholder of a corporation making a tender offer is in a position to have a significant impact on the future of that corporation, information about the stockholder may well be material to a decision of stockholders of the target whether to take the offer or hang on with the hope of a greater return. See Prudent Real Estate Trust v. Johncamp Realty, Inc., 599 F.2d 1140, 1147 (2d Cir.1979). The same is not true, however, when one is speaking of a stockholder that has not been shown to possess the potential for significantly affecting the future of the corporation making the tender.
 
 
 18
 This brings us to a final point. Under Item 9, financials are not required even from a "bidder" unless they would be "material to a decision by a security holder of the subject company whether to sell, tender or hold securities being sought in the tender offer." Thus, even if Interco were legally correct in contending that Drexel is a "bidder," the failure to provide Drexel's financials would be a ground for enjoining consummation of the tender offer only if Interco had shown some basis for believing that those financials would provide information that Interco's stockholders would find of interest in responding to the tender offer. During discovery Interco had access to Drexel's financials and we see no reason why we should presume that those documents would be of interest without any record basis for so concluding. Where the financials at issue are those of a controlling entity, such a presumption might well be appropriate, but not here.[6]
 
 III.
 
 19
 Since Interco has failed to show a likelihood of success on its contention that disclosure of Drexel's financials were required by the regulations, the order of the district court denying a preliminary injunction will be affirmed and this court's injunction pending further order of the court will be vacated. The mandate will issue forthwith.
 
 
 20
 WEIS, Circuit Judge, dissenting.
 
 
 21
 The issue before us is a narrow one--whether Drexel Burnham Lambert is a "bidder" required to make certain disclosures under the Williams Act. The district judge believed that, in its activities at issue here, Drexel Burnham "has gotten dangerously close to the point at which this Court would not hesitate to classify Drexel Burnham as a bidder." I am convinced that Drexel passed that point and is within the class of persons Congress intended to be governed by the Williams Act.
 
 
 22
 In cases such as this where a regulatory agency lurks in the wings, there is an unfortunate tendency for the litigants to rely almost entirely on regulations, rulings, releases, and other appendages rather than referring to the governing statute itself. The agency publications are then construed by the litigants in the manner most favorable to their best interests, seizing upon isolated administrative utterances to bolster the arguments and in the process losing sight of the plain language of the legislative enactment and its evident intent.
 
 
 23
 The resolution of the issue before us should begin with the statute itself. The Williams Act provides in pertinent part:
 
 
 24
 "It shall be unlawful for any person, directly or indirectly, ... to make a tender offer for ... any class of any equity security ... if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than five per centum of such class, unless ... such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribed as necessary or appropriate in the public interest or for the protection of investors."
 
 
 25
 15 U.S.C. Sec. 78n(d)(1).
 
 
 26
 Two observations on this language are worth noting. First, the statute does not use the word "bidder." Second, the discretion entrusted to the Securities and Exchange Commission--a quite broad delegation--is to determine what "additional information" beyond that listed in the statute should be required of the "person" making a tender. The statute does not purport to grant the SEC discretion to determine who shall file the statement with the agency.
 
 
 27
 The Act provides a broad definition of "person." "When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for purposes of this subsection." 15 U.S.C. Sec. 78n(d)(2). Thus, the word "person" includes not only its plural, but entities such as partnerships, syndicates, and "groups" as well.
 
 
 28
 The word "bidder" is a term that the SEC adopted obviously for ease of reference. In a 1979 Release, the agency explained that the "terms 'bidder' and 'subject company' provide short-hand references to the principal participants in a tender offer and avoid certain pejorative terms now commonly used to describe participants in a tender offer. The term 'bidder' would mean any person who makes a tender offer or on whose behalf a tender offer is made." Securities Exchange Act Release No. 15548, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 81,935, at p. 81,216 (Feb. 5, 1979).
 
 
 29
 It is significant that in using the term "principal participants" the SEC Release was referring to both the bidder and the subject company--not the bidder alone. There is no basis to infer that "principal participants" applies to only some of the "bidders."
 
 
 30
 In a regulation, the SEC did define "bidder" as "any person who makes a tender offer or on whose behalf a tender offer is made." 17 C.F.R. Sec. 240.14d-1(b)(1). This definition simply tracks the language of the statute, however, and does not purport to limit the class of those required to comply with the Act. It follows that the agency's use of the word "bidder" must be read in harmony with the statutory language and not as an attempt to narrow the scope of the Act--action beyond the Commission's authority. To avoid terminological confusion, I shall also use the word "bidder" as designating those required by the Williams Act to make disclosure.
 
 
 31
 The legislative history states that the term "person" as used in section 14(d)(2) is identical with section 13(d)(3). In explaining the latter subsection's definition of person, the House Report stated:
 
 
 32
 "This provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert. Consequently, the group would be required to file the information called for in section 13d(1) within 10 days after they agree to act together, whether or not any member of the group had acquired any securities at that time. This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership of securities by reason of any contract, understanding, relationship, agreement or other arrangement."
 
 
 33
 H.R.Rep. No. 1711, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 2811, 2818. Congress thus intended that disclosure be made by those expansively designated persons or groups obtaining the benefit of securities ownership through a variety of arrangements.
 
 
 34
 In defining the need for the legislation, Congress acknowledged the difficulties that a shareholder faces when notified of a tender offer. Given the many variables inherent in such offers, the decision whether to accept the tender, sell the stock in the market, or hold the shares should be made on the basis of adequate information. "Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision. He is forced to take a chance. For no matter what he does, he does it without adequate information to enable him to decide rationally what is the best possible course of action." Id. at 2812. As the Committee reasoned:
 
 
 35
 "The persons seeking control, however, have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision....
 
 
 36
 "The bill avoids tipping the balance of regulation either in favor of management or in favor of the persons making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.
 
 
 37
 "While the bill may discourage tender offers or other attempts to acquire control by some who are unwilling to expose themselves to the light of disclosure, the committee believes this is a small price to pay for adequate investor protection."
 
 
 38
 Id. at 2813. See also Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57-58, 95 S.Ct. 2069, 2075-76, 45 L.Ed.2d 12 (1975); 11A E. Gadsby, Business Organizations: The Federal Securities Exchange Act of 1934 Sec. 7A.01 (A. Sommer ed. 1988). As the Supreme Court characterized the legislative intent, "what Congress had in mind was the protection of shareholders, the 'pawn[s] in a form of industrial warfare.' " Piper v. Chris-Craft Indus., 430 U.S. 1, 30, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977).
 
 
 39
 The need for full disclosure during the pendency of the tender has been echoed by the Courts of Appeals. In Prudent Real Estate Trust v. Johncamp Realty, Inc., 599 F.2d 1140, 1147 (2d Cir.1979), the Court of Appeals for the Second Circuit surmised that, if the bidder is prosperous, "the stockholder might decide to hold his shares in the hope that, if the offer was only partially successful, the bidder might raise its bid after termination of the offer or infuse new capital into the enterprise." On the other hand, the "poor financial condition of the bidder might cause the shareholder to accept for fear that control of the company would pass into irresponsible hands." Id.
 
 
 40
 Similarly, in the case of a partial tender, a shareholder must weigh staying with the company and the bidder as part of the minority bloc, a decision in which the bidder's financial condition may be quite significant.
 
 
 41
 The appellate courts have had little opportunity to determine what entities should be considered as offerors. Perhaps this is not surprising, for in most tender cases time constraints preclude an appeal from the decision of the district court.
 
 
 42
 In Prudent Real Estate Trust, the Court of Appeals for the Second Circuit required disclosure from the principal stockholder of a corporation that partially owned and controlled the acquisition vehicle. In that case, the interests represented by the principal stockholder supplied 20% of the financing, but he had the right to vote shares acquired from the target company and to manage its properties after acquisition. Prudent Real Estate Trust, 599 F.2d at 1147. See also Arkansas Best Corp. v. Pearlman, 688 F.Supp. 976 (D.Del.1988) (individual defendants controlled companies which owned acquisition vehicle, and were committed to purchase $37 million of target stock).
 
 
 43
 In Koppers Co. v. American Express Co., 689 F.Supp. 1371 (W.D.Pa.1988), the district court noted that the defendant Shearson companies had acquired a substantial, although not controlling, interest in the acquisition vehicle. In addition, the Shearson interests had committed themselves to provide a large financial contribution to the purchasing company and, in return, take either unsecured subordinated notes or preferred stock with limited voting rights. Moreover, Shearson would earn substantial brokerage fees. As the court pointed out, the Shearson interests acted as advisor, underwriter, equity partner, and financier to the acquisition vehicle. In those circumstances, the court ruled that the Shearson companies were playing a central, participatory role in the tender offer; the fact that they would control less than 50% of the acquisition vehicle would not exempt them from bidder obligations. Id. at 1389-90. The majority distinguishes Koppers because the Shearson companies were to have representation on the board of the surviving entity. That distinction is unconvincing--the test is beneficial ownership of stock.
 
 
 44
 In Pabst Brewing Co. v. Kalmanovitz, 551 F.Supp. 882 (D.Del.1982), the court determined that two individuals were the "primary motivating force behind the formation and capitalization of [the acquiring vehicle] for the effectuation of the tender offer." Id. at 892. In that case, the acquiring corporation had been created for the express purpose of extending a tender offer. The court distinguished dissimilar rulings in Raybestos-Manhattan, Inc. v. Hi-Shear Indus., 503 F.Supp. 1122 (E.D.N.Y.1980), and Gray Drug Stores v. Simmons, 522 F.Supp. 961 (N.D.Ohio 1981), where the acquiring corporation had not been formed for the purpose of accomplishing the acquisition. Pabst Brewing Co., 551 F.Supp. at 891-92. Because I am not persuaded that Raybestos and Gray Drug Stores are correctly decided, I need not consider here whether the distinction that the court drew in Pabst was significant.
 
 
 45
 Other district courts have been diverted from the basic "offeror" inquiry by focusing on whether the alleged bidder has a "dominant" or "controlling" role in the transaction, or whether that entity or another corporation--even a "shell"--is the actual offeror. Nothing in the Act indicates that Congress intended that only an entity or individual that "dominates" or "controls" the group making a tender offer is bound by the disclosure requirements. The absence of language narrowing the statute's application in that manner is compelling, as is the legislative history which sought to prevent the "pooling" of interests as a device to evade disclosure.
 
 
 46
 The Williams Act, as illustrated by its legislative history, is not concerned with dominance by particular entities within an offering group, but rather with the desirability of disclosures by all parties who combine to make an offer. The expressed intent of Congress was full and fair disclosure. Therefore, in the event of doubt on a particular disclosure question, courts should exercise liberality in order to carry out the remedial purposes of the statute. Excess information may well be harmless, but inadequate disclosure could be disastrous to the shareholder.
 
 
 47
 The majority relies principally on an interpretation of Item 9 of the SEC's special instructions for complying with the Schedule 14D-1 disclosure requirement. See 17 C.F.R. Sec. 240.14d-100. I pass over the interesting question of whether such agency "instructions" can amount to an administrative construction of the statute because I read Item 9 as not constricting the scope of disclosure, but instead as a caution against evasion.[1]
 
 
 48
 As the district court pointed out in Arkansas Best Corp. v. Pearlman, 688 F.Supp. 976 (D.Del.1988), "[u]nder the plain wording of Item 9, it would appear that natural persons who are bidders would never have to disclose material financial information." Id. at 980. However, the SEC stated in a Release that "financial information concerning a bidder who is a natural person may be material." Securities Exchange Act Release No. 13787 [1977-78 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 81,256, at p. 88,379 n. 2 (July 21, 1979). In Arkansas Best the district court found that individuals who were the dominant and motivating principals behind a series of partnerships and corporations formed for the purpose of making a tender offer were bidders. That case demonstrates the danger of relying on the wording in Item 9 without considering its purpose.
 
 
 49
 Properly read, Item 9 heeds the statutory language which prohibits "any person, directly or indirectly" from making a tender offer without complying with the Act. See 15 U.S.C. Sec. 78n(d)(1). The formation of a shell corporation for the purpose of making a tender without disclosing who or what is behind the legal facade would be a blatant device to circumvent the express congressional prohibitions against an undisclosed party "indirectly" acquiring beneficial ownership. The SEC recognized this danger and, in discussing the proviso to Item 9 stated, "However, it should be specifically noted that the Commission will not tolerate schemes to circumvent the requirements of Item 9 by relying on this proviso." Securities Act Release No. 58444 [1977-78 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 81,256, at p. 88,380 (July 21, 1977) (citing example of shell corporation formed for reasons other than acquisition).
 
 
 50
 The Rales brothers apparently recognized that Item 9 did not exclude them as natural persons from the "bidder" designation and its incumbent disclosure obligations. In contrast, the majority's interpretation of Item 9, taken to its logical conclusion, would suggest that the disclosures made by each of the Rales brothers were gratuitous--a result I doubt the majority or the SEC would espouse.
 
 
 51
 I believe that the district court erred as a matter of law in concluding that Drexel Burnham is not a bidder. Drexel Burnham obviously is a critical player in the Interco tender offer scenario. It expects to receive between 29% and 36% of voting stock, and substantial proceeds in the event of either success or failure of the tender offer.
 
 
 52
 The present situation is quite different from one in which a lending institution enters into an arrangement where it seeks the return of the amount it had loaned with interest. The record here conclusively demonstrates that Drexel Burnham's involvement in the Interco tender far surpasses such a lender-offeror relationship. Drexel Burnham is actually a participant in the venture as a major stockholder--indeed, planning to obtain more shares than each of the Rales brothers. It may be that, if the Rales brothers pool their shares, Drexel Burnham could be out-voted. That result, however, is not inevitable and, in any event, the Williams Act does not restrict disclosure to only the holders of majority interests. It requires compliance by those who become holders of "beneficial interests."[2] That description fits Drexel Burnham.
 
 
 53
 Events which have occurred since the district court considered the matter have served only to confirm the conclusion that Drexel Burnham is a "bidder." Apparently, Drexel Burnham was unable to secure outside support for a substantial part of the financing it had pledged to provide. As a result, in the Second Supplement to the tender offer dated October 4, 1988, the following statement appears: "The Purchaser [Cardinal Acquisition Corp.] also has received a commitment letter, dated as of September 26, 1988 ("Group's Commitment Letter") from the Drexel Burnham Lambert Group Inc. whereby Group has agreed to purchase an aggregate of $609.685 million of Series A Stock and Series B Stock ("Group's Commitment")."[3]
 
 
 54
 I am not impressed by the fact that, superficially, it appears that Drexel Burnham did not become a participant in the venture until after the initial tender was made. Whatever may have been true at the outset of the venture, it is clear that once additional "bidders" are added to the roster, appropriate supplemental disclosure must be made. Otherwise, the opportunities for evasion are so glaring as to frustrate the important goals of the Williams Act.
 
 
 55
 Whether disclosure beyond that already made must be forthcoming is a question of materiality. Information is material, and disclosure compelled, if there is a substantial likelihood that a reasonable investor would consider the disclosure to have changed the "total mix" of his investment deliberations. TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This is largely a fact-driven assessment which should, in the first instance, be made by the district court. Because the district judge here decided the case on the theory that Drexel Burnham was not a bidder, there was no necessity for findings on the materiality issue and none were made. I would therefore remand to the district court for determination of that question and stay the closing of the tender offer until a ruling is made.
 
 
 
 [1]
 We decide this appeal on the record before the district court. Interco supplemented that record with an affidavit in support of its motion for a stay pending appeal. That affidavit asserts that, as of October 4, 1988, Drexel had committed itself to purchase an aggregate of $609.685 million of the preferred securities. We leave it for the district court to determine in the first instance the significance, if any, of this fact
 
 
 [2]
 In their filing, these entities acknowledged being members of a "group." The "bidder," however, was identified as Acquisition
 
 
 [3]
 We, of course, accept the unappealed rulings of the district court rejecting Interco's claim that the tender materials contained two material omissions
 
 
 [4]
 Drexel was retained on July 29, 1988. By that date City Capital had already devised its offer strategy; made a $64 merger proposal to Interco; publicly announced the proposal; accumulated over 3 million Interco shares at a cost of over $117 million; filed a Schedule 13D with the Securities and Exchange Commission disclosing its plans to seek to merge with Interco; and filed two lawsuits against Interco and its Board of Directors
 
 
 [5]
 This fact distinguishes this case from Koppers Company, Inc. v. American Express Company, 689 F.Supp. 1371 (W.D.Pa.1988), upon which Interco primarily relies. In that case the equity securities held by the Shearson Lehman interests entitled them to representation on the board of the surviving company and the court viewed the Shearson Lehman interests as sharing control of the board with others
 
 
 [6]
 The dissent suggests that the concept of "bidder" as utilized in the regulations is intended to be synonymous with the statutory concept of a "group". See 15 U.S.C. Sec. 78n(d)(2) (1981). While the regulations do implement the statutory provisions regarding "groups," see, e.g., 17 C.F.R. Sec. 240.14d-100 General Instruction C, they do not do so through the concept of a "bidder." At oral argument counsel for Interco expressly disavowed any contention that Drexel was a member of the Rales "group" and no such argument was presented to the district court. Accordingly, we have no occasion to express an opinion on that issue
 
 
 [1]
 It is doubtful that "instructions" on how to complete a form qualify as an administrative construction of a statute so as to be entitled to the deference cited in Chevron, USA v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984) or SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed.2d 1995 (1947). The "instructions" are not a reasoned, considered discussion of the statute
 
 
 [2]
 See Portsmouth Square, Inc. v. Shareholders Protective Comm., 770 F.2d 866, 873 (9th Cir.1985) ("beneficial owner" of security for section 13(d) purposes--subject to disclosure obligations--is anyone having power to vote, invest, or dispose of security); GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir.1971); Bath Indus., Inc. v. Blot, 427 F.2d 97, 112 (7th Cir.1970) ("beneficial owner" under section 13(d) is anyone with right to determine how stock is voted). See 17 C.F.R. Sec. 240.13d-3. SEC Rule 14d-1(g) states that the definition of beneficial ownership set forth in Rule 13(d)(3) also applies to section 14(d)(1)
 
 
 [3]
 The exemption provided by 17 C.F.R. Sec. 240.13d-3 would not apply here where Drexel Burnham initially agreed to purchase stock