MAI BASIC FOUR, INC., and Choice Corporation, Plaintiffs, Appellants,

v.

PRIME COMPUTER, INC., et al., Defendants, Appellees.

Nos. 89–1149, 89–1150.

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1988.

Decided March 29, 1989.

William McGuinness, New York City, with whom Gary R. Greenberg, Mark A. Berthiaume, Goldstein & Manello, Boston, Mass., and Fried, Frank, Harris, Shriver & Jacobson, New York City, were on brief, for plaintiffs, appellants.

James C. Burling with whom Jeffrey B. Rudman, William G. McElwain, Mark G. Matuschak, Wayne L. Stoner, Boston, Mass., William H. Paine, Brookline, Mass., Hale and Dorr, Boston, Mass., and Wachtel, Lipton, Rosen & Katz were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, COFFIN, Senior Circuit Judge, and BOWNES, Circuit Judge.

COFFIN, Senior Circuit Judge.

This expedited appeal arises out of the efforts of a group of companies in the computer industry, MAI Basic Four, Choice Corporation, and Brooke Partners, L.P. (collectively Basic), to take over control of Prime Computer, Inc. (Prime). Although Basic filed the first complaint, attacking Massachusetts anti-takeover statutes in connection with its November 15, 1988, tender offer, the present issues flow from the district court's action on Prime's counterclaim. In this counterclaim Prime alleged, principally, that Basic had violated the Williams Act Amendments to the Securities Exchange Act (the Act), 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f), by failing to disclose in its Offer to Purchase sufficient information concerning the involvement, interests, and condition of its investment advisor, investor, and underwriter, Drexel Burnham Lambert, Inc. (Drexel). It contended that Drexel fell under the Act's disclosure requirements because it was in reality a "bidder." SEC Rule 14d–1(b)(1), 17 C.F.R. § 240.14d–1(b)(1); Rule 14d–6, 17 C.F.R. § 14d–6; SEC Schedule 14D–1, 17 C.F.R. § 240.14d–100.

Prime sought a preliminary injunction against consummation of the tender offer, which was granted on December 9, 1988. The injunction has survived several subsequent proceedings in which supplemental disclosures made by Basic were considered. The inquiry on this appeal is whether the district court committed either an error of law or abuse of discretion in continuing to enjoin the consummation of the offer pending receipt of further information from Basic regarding Drexel.

### The Tender Offer

The elements of the tender offer are as follows. Basic is offering $20 a share in cash for all shares of Prime, a price that exceeds the pre-offer market price. As of the date of oral argument, March 2, 1989, approximately 61 percent of Prime stock

had been tendered, 46 percent on a fully diluted basis.[1] The offer is conditioned upon there being tendered, prior to its expiration, 67 percent of the shares on a fully diluted basis. Other conditions include action taken to render inapplicable Prime's new "Employee Protection Plan," Basic being satisfied that the merger of Basic and Prime would not violate the Delaware General Corporation law (requiring tender of 85 percent or more of Prime's shares), and Basic being satisfied that certain Massachusetts antitakeover statutes are either invalid or inapplicable. The financing consists of $20 million in cash, supplied by Brooke Partners, L.P.; $650 million in bank financing; and $875 million in high yield, interest bearing, increasing rate notes (*i.e.*, "junk bonds"), placement to be arranged by Drexel. Upon consummation of the offer, Basic intends to merge itself and Prime and cash out any remaining Prime stockholders at $20 a share.

### Drexel's Involvement

Drexel's past, present, and contemplated roles in connection with the offer lie at the heart of this appeal. Since 1986 Drexel has been associated in arranging financing for Basic's principal stockholders, Bennett S. LeBow and William Weksel, in several other acquisitions (of Liggett Group, Inc. and of Western Union Corp.) in which Drexel has obtained both substantial fees and equity positions. In the spring of 1988, Drexel tried unsuccessfully to interest Prime in buying MAI Basic Four. Subsequently, Basic decided to be the acquirer. Drexel's undertaking, as financial advisor for this transaction, is to "include, but not be limited to ... advising and assisting [Basic] in determining the possible alternative ways in which the Transaction might be structured, and advising and assisting [Basic]

with respect to the completion of the Transaction." Supp.App. Vol. I, Affidavit of Mark Matuschak, Ex. 4, K, Letter of November 14, 1988, to Bennett S. LeBow, p. 1.

Drexel has an equity interest in MAI Basic Four, Inc., which will be 5 percent on a diluted basis, with a right to purchase at half price another 9 percent. In addition to this 14 percent of direct interest, it possesses, through two intermediary partnership entities, a one-third equity interest in Le-Bow, Inc., and, through another entity, a 17 percent equity interest in Brooke Partners. LeBow, Inc., is the sole owner of L. Holdings, which is Brooke's sole general partner. As of the date of the offer, Drexel also, through a stockholders agreement, had the right to name one of the three directors of LeBow, Inc., with veto power over some corporate actions. During this litigation, the agreement was changed to remove Drexel's right to a board member, but Drexel continues to have the right to attend board meetings and is guaranteed first refusal in future underwriting and placement.

Drexel's role in placing $875 million in junk bonds will entitle it to $65 million in fees, if the placement is successful. At the moment, the record indicates that none of these notes have been sold. Even if the offer fails, Drexel will be entitled to 15 percent of any profit Basic realizes from selling Prime stock now held. There is some ambiguity with regard to a further role Drexel may have in relation to the notes. The offer to Purchase merely reflects Drexel's view that it is "highly confident" that it can place the $875 million of notes and its agreement "to use its best efforts to arrange the financing." (Supp. App. Vol. I, Ex. 4, A, Offer to Purchase, p. 25.) But Weksel testified in a deposition that he expected Drexel to furnish[2] any

---

1. That is, after taking into account additional shares projected to be issued in connection with (or in response to) the tender offer.

2.    Q  What will you use for money to buy the stock if you don't have sale of proceeds from the notes?
   A  To the extent that money would have to be supplied, I suspect that Drexel would sup-

ply it, whether the road show is complete or not.
  ....

   Q  Will Drexel in your understanding come up with $875 million so you can buy Prime shares regardless of the status of the sale of the notes?
   A  I can't specifically answer that question.

funds needed to complete the transaction even if all the notes were not sold.

### Proceedings in the District Court

With this background, we now focus on the proceedings in the district court. In this case, unlike most cases, we review not merely one decision, but are exposed to several district court opinions at different stages of the evidence. Seldom have we had the benefit of so clear a record of the evolution of a judge's thinking.

After granting Prime's motion for a preliminary injunction on December 9, 1988, the court issued on December 13 "a more precise statement of my order" to enable Basic to know what further disclosures were required. The court observed that the offer adequately disclosed the problems involved in complying with the Delaware Corporation Law. It refrained from ruling on a possible violation of margin requirements, but found that there had been inadequate disclosure as to the relationships among Brooke Partners, L.P., B.S. LeBow, Inc., Drexel, and the latter's unnamed officers and employees, who comprised various limited partnerships. It further found that, in the light of Drexel's and its officers' and employees' relationship with Messrs. LeBow, Weksel, and the three established bidding entities, Drexel was a bidder for Prime within the meaning of SEC Rule 14d–1(b)(1), 17 C.F.R. § 240.14d–1(b)(1). In addition, the court specifically noted that Basic had failed to disclose its plans, if the tender offer were successful, to sell off assets and lay off personnel; and called for additional information about prior violations of the federal securities laws.

Soon thereafter, on December 19, 1988, Basic moved to vacate the injunction on the basis of a supplementary disclosure, submitted in the interest of avoiding further litigation. The disclosure, proposed to be added in a Supplement to the Offer to Purchase, revealed in some detail relationships of Drexel to the various LeBow-controlled entities; Drexel's expected fees, its right to perform services, and its putative equity interest; and Basic's intention to review operations and structure and combine functions which might involve a reduction in personnel and disposal of excess facilities. The disclosure noted that, based on publicly available information, research and development expenditures might be a proper area for cost cutting. It also noted the filing of various civil actions against Weksel and LeBow.

Argument was heard on December 28, 1988. The court rendered its second opinion the following day, concluding that it was satisfied with the disclosure as to an "ongoing civil and criminal investigation" of Drexel and with disclosure of "Drexel's identity and role in this acquisition, its transactions or negotiations, its ownership of Prime shares, its arrangements and contracts concerning Prime shares, and its purpose in participating in the acquisition." Then the court added, "I am still not satisfied, however, that there has been sufficient disclosure as to the source of funding to be used by Drexel in connection with the tender offer. Nor am I satisfied by disclosures about Drexel's current financial condition." The court then referred specifically to Drexel's willingness to plead guilty to six felony counts of mail, wire, and securities fraud and the Delaware Chancery Court's refusal to issue a preliminary in-

Q You don't know if Drexel will come up with $875 million to assist you in the purchase of these shares on February 15?
A I believe they will.
Q You believe that Drexel will produce $875 million if asked on February 15 to assist you in the charge of these shares even if not a single note has been sold; is that your testimony?
A Yes.
Q Who at Drexel has told you that Drexel will come up with $875 million in the absence of the sale of one note?

A Nobody has told me that
. . . .
Q What is the basis for your belief that Drexel will produce $875 million from some source for the purchase of these shares in the absence of a single note sale?
A Because I believe that based on Drexel's highly confident letter they will come up with the money.
Supp.App. Vol. II, Ex. 5, A, pp. 327, 330–331.

junction to Basic setting aside the various protective devices adopted by Prime's directors.

After devoting two-thirds of its opinion to a possible violation of margin requirements, the court returned to its concern over the fragility of the financial arrangements, noting Drexel's recent agreement to pay a $350 million fine and a minimum of $300 million to satisfy future civil liability. It observed that "All of this raises profound questions about Drexel's own financial condition, and its ability to obtain the financing needed if the acquisition of Prime is to occur. These concerns must be explicitly addressed."

The court then vacated the injunction insofar as it was based on the inadequacy of disclosure of Drexel's participation, but continued it until, *inter alia*, adequate disclosures of "Drexel's current ability to obtain and provide adequate financing for the Offer" were made.

Shortly thereafter, on January 24, 1989, Basic filed its Supplement to the Offer to Purchase. This reported on the outcome of the Delaware Chancery Court litigation, on other litigation, on Drexel's various relationships with LeBow-controlled entities, and on Basic's plans for the future. It also reported the proposed plea agreement with the United States Attorney for the Southern District of New York under which Drexel would pay $650 million in criminal fines and civil compensation to injured claimants. Insofar as Drexel's financial condition was concerned, the Supplement contained the following paragraph:

Drexel Burnham has advised Parent and the Purchaser that, even with the events set forth in the foregoing paragraph taken into consideration, Drexel Burnham remains highly confident that it can arrange the placement of up to $875 million of the Notes as set forth in the highly confident letter delivered to Parent and the Purchaser on November 15, 1988. In connection therewith, Drexel Burnham has advised Parent and the Purchaser that since the December 21, 1988 Proposed Plea Agreement was announced, it has continued to be, and expects to remain, a very active participant in the high yield securities market (which includes financings involving securities similar to the Notes) and that it anticipates that from the date the Proposed Plea Agreement was announced through the end of January 1989, it will have consummated private placements and public offers of debt securities providing gross proceeds to its clients aggregating in excess of $2 billion. Drexel Burnham has also advised Parent and the Purchaser that, after giving effect to the amounts required to be paid under the Proposed Plea Agreement, Drexel Burnham would have total capital in excess of $2 billion.

Supplement to Offer to Purchase at 18–19.

On the same day, January 24, Basic again moved to vacate the injunction. On February 2, Prime opposed the motion, and filed with the court a disclosure made in connection with another case. *City Capital Assocs. Ltd. Partnership v. Interco, Inc.,* 860 F.2d 60 (3d Cir.1988). That case concerned a recent tender offer in which Drexel was the dealer/manager for Cardinal Acquisition Corp. in its efforts to acquire the stock of Interco, Inc. The U.S. District Court for the District of Delaware had held Drexel not to be a bidder for Interco. After oral argument on this issue before the Court of Appeals for the Third Circuit, and after the granting of an injunction against the purchase of shares pending further order of court, the purchaser and Drexel, to facilitate the transaction, without conceding that the information was required or that Drexel was a "co-bidder," furnished the following information concerning Drexel and its holding company, the Drexel Burnham Lambert Group, Inc.:

—Table A: Selected Financial Data on a "marked-to-the-market basis," showing, *inter alia,* "Stockholders' Equity" for several years including the amount of $1,436,055,-000 as of June 24, 1988; and net income for several years including $130,192,000 for the year ending December 25, 1987.

—Table B: Selected Income Statement Data on a LIFO basis, showing net income

for several years including $161,206,000 for the year ending December 25, 1987.

—Schedule I: Directors and Executive Officers of Drexel Burnham and Group, containing the names and positions of 51 people.

—Schedule II: Transactions in shares by Drexel Burnham and Group within 60 days prior to the offer, together with data covering purchases and sales in a program trading account over a four-month period.

On February 7, the court held a hearing on Basic's motion to vacate the injunction. The court first reviewed its prior rulings. The court acknowledged its satisfaction with the disclosures made as to Drexel's role and relationships, and recalled its December 29 ruling continuing the injunction pending further disclosures concerning Drexel's ability to obtain adequate financing, the impact of the contemplated guilty plea, etc. The court revealed the results of a lobby conference in mid-January, after Basic had submitted additional disclosures which the court felt should be submitted to the shareholders of Prime. At that earlier juncture, the court had felt prepared to vacate the injunction; it had felt that "[t]he playing field was even." The court had also tentatively concluded that the issue of margin violations did not need to hold up the offer further.

Next the court described the impact on it made by the revelation of the disclosures regarding Drexel made in the *Interco* case. It stated that although it had declared Drexel to be a bidder for Prime, it had not insisted on the line-by-line information required by SEC Rule 14d–1(b)(1), because it thought that such information would be difficult and costly to assemble and of somewhat limited utility to institutional shareholders. Before learning of the *Interco* disclosures, the court had assumed that Basic's recent disclosure concerning

Drexel's financial ability, quoted in full *supra*, was a good faith effort to comply with its order.

The court then contrasted the minimal disclosures made in this case with the information presented in *Interco*, declaring the omission of similar information "inexcusable and inexplicable ... especially troubling ... because of Drexel's legal problems." It concluded that the "playing field is still tilted against the shareholders." It continued the injunction and denied the motion to vacate "pending these disclosures, this time fully consistent with the federal securities laws."

### Contentions of the Parties

The positions taken by the parties could not be farther apart. Basic first contends that it has furnished all the information required by the court and that the court has acknowledged as much. Then it challenges the court's finding that Drexel is a bidder. Finally it argues that even if Drexel could be considered a bidder, no additional disclosure is required by the Act. When asked why Basic could not readily furnish the kind of information concerning Drexel that was provided in *Interco*, counsel's response was that other questions would be asked and that "no amount of disclosure is ever going to be enough."[3]

Prime, on the other hand, maintains that Drexel should, as a bidder, furnish all items of information required for compliance with Schedule 14D–1. In oral argument counsel stated, without citing any authority, that even if Drexel is not a bidder, it is still such a key participant that its financial condition was material information which must be more thoroughly disclosed under the Williams Act.[4]

### Discussion

We begin by noting the criteria that guide our review, quoting from our opinion

---

**3.** In its brief, Basic stated that it pursued this expedited appeal "to get off the judicial carousal [sic] it has been riding for the last two months."

**4.** Subsequent to the submission of this case for decision, we have learned that Prime has filed a separate appeal, challenging the district court's earlier findings that sufficient information had

been furnished concerning Drexel's role and relationships, Basic's future plans, etc. While we do not formally resolve the issues raised in that appeal, our decision here, particularly our view of the scope and reasonableness of the district court's discretion in this case, will unavoidably have implications for Prime's appeal.

in *San Francisco Real Estate Investors v. Real Estate Investment Trust of America*, 701 F.2d 1000, 1002 (1st Cir.1983):

> The district court properly noted the familiar four part inquiry into (1) plaintiff's likelihood of success on the merits, (2) the irreparability of harm to plaintiff if relief is not granted, (3) the excess of such harm over harm to defendant if relief is granted, and (4) the adverse effect on the public interest if relief is granted. *Agency Rent–A–Car, Inc. v. Connolly*, 686 F.2d 1029 (1st Cir.1982). We note in addition the constraints laid on us to defer to the district court's action unless we find an abuse of discretion or error of law. *Burgess v. Affleck*, 683 F.2d 596 (1st Cir.1982); *Crowley v. Local No. 82*, 679 F.2d 978, 994 (1st Cir.1982).

We are cognizant of the irreparable harm suffered by a takeover aspirant by any unjustifiable delay of consummation of a tender offer. *Id.* at 1003. But we also value the utility of injunctive relief to prevent violations of disclosure requirements. As the Third Circuit Court of Appeals has stated:

> Prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions. But once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible to "unscramble the eggs." On the other hand, preliminary relief does not, in assuring that the offer will be lawfully made, sacrifice the legitimate desires of shareholders to accept the offer. If the offeror is subsequently vindicated after a trial on the merits, the offer may be renewed.

*Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846, 851 (3d Cir.1973) (citations omitted). Thus, to the extent target shareholders may be deprived of material information required to be disclosed under the Williams Act before irrevocably tendering their shares, they will be irreparably harmed.

The interests in avoiding unnecessary delay in tender offers and in preventing violations of the Act being in a delicate balance, each in turn serving the public interest, we see the factor of likelihood of success on the merits as the critical one. We proceed to that issue.

We first dispose of Basic's argument that all the information that the court required was furnished. Basic quotes liberally from the court's expressed thinking up to, but not including, its bottom-line disenchantment with what had been provided, albeit in the light of what had been provided in a separate case. Expressions of a judge's views during a proceeding cannot be taken as graven in stone until he has completed his decisional process. Insofar as the argument is that all *material* information has been furnished, we reserve our discussion until after we resolve the bidder issue.

The facts in this case bear some similarity to those in *Koppers Co. v. American Express Co.*, 689 F.Supp. 1371 (W.D.Pa. 1988), where an investment bank was held to be a bidder for purposes of Rule 14d. In *Koppers*, two Shearson entities, Shearson Holdings and its subsidiary Shearson Lehman, and their indirect subsidiary, SL–Merger, Inc., were found collectively to have become aggressively involved in a takeover plan at an early stage; to have contributed $23.05 million for purchasing shares of the target; to own 46 percent of the Class B common stock in the target; to have committed themselves to a contribution of $570 million for notes or preferred stock; and to have earned large brokerage fees. The court accepted, as criteria for a bidder, "those who are central to the offer," 689 F.Supp. at 1388 (citation omitted), "playing a central participatory role," being "a motivating force," "one of the principal planners and players." *Id.* at 1390. It acknowledged the multiple roles of the Shearson entities—advisor, underwriter, equity partner, financier, broker-dealer—deeming these roles as far surpassing that of an investment banker. The court labelled Shearson "a major equity participant," "one of the entities on whose behalf the tender offer is made." *Id.*

In the case at bar, Drexel has equity interests in various affiliates associated with LeBow. It has a background of association with Basic and other LeBow interests. Like Shearson in *Koppers*, Drexel participated in the planning of the Prime tender offer very early, well before the offer. It had a director with veto power in LeBow, Inc., the sole owner of the general partner of Brooke Partners. Brooke in turn supplied the entire $20 million of equity for this highly leveraged deal, which funds Drexel was instrumental in raising through earlier tender offers. Drexel has relinquished this directorship, but only after commencement of the tender offer and without explication. Of course the projected equity position of Drexel is far less than Shearson's 46 percent interest in *Koppers*. Finally, Drexel will enjoy substantial fees, perhaps in excess of $65 million, for its heavy participation in the offer.

In a similar vein, the present case is at least somewhat distinguishable from *City Capital Assocs. Ltd. Partnership v. Interco, Inc.*, 860 F.2d 60 (3d Cir.1988). In *Interco*, the court of appeals pointed out that Drexel was not engaged by the acquirer until after the tender offer was made. The court distinguished *Koppers* on the basis that Drexel was to have no representation on the board of the surviving entity, *id.* at 63 n. 5., and emphasized that there was no indication that Drexel had any control over the offer or that it would have any other role than that of investor. *Id.* at 63. The court chose not to determine the significance of a recent development, that (apparently due to its inability to secure outside financing) Drexel had committed itself to purchase $609 million of preferred securities, implying that on this basis the district court might properly reach a different result on the bidder issue.

Given Drexel's early and pervasive role in the planning and execution of the present offer, its erstwhile board representation in the corporation controlling the sole equity participant in the bidder group,

and record evidence sufficient to reasonably suggest an expectation, though not a contractual obligation, that Drexel would itself provide additional financing if it could not place the $875 in junk bonds elsewhere, we might accept the approach of the Third Circuit while distinguishing *Interco* on its facts. Such a decision on our part would be consistent with one of the formulations of the test in *Interco*, that if a stockholder in an acquirer "is in a position to have a significant impact on the future of that corporation, information about the stockholder may well be material to a decision of stockholders of the target whether to take the offer or hang on with the hope of a greater return." *Id.* at 65.

But we recognize that in the end the court in *Interco* concluded that financial statements are not required from an entity that will wind up as a minority stockholder. It reached this result based on the perceived need for a bright-line test in the takeover context, requiring a narrow construction of Rule 14d–1(b)(1), and a strict application of Schedule 14D–1, General Instruction G, Item 9, 17 C.F.R. § 240.14d–100, reading the latter to indicate that "bidder" under the SEC regulations means an entity formally making a tender offer and those who *control* it. Because the traditional indicia of control were lacking, ipso facto Drexel was deemed not to be a bidder. We think the more realistic prescription is that of *Interco's* dissenter, who wrote:

> [I]n the event of doubt on a particular disclosure question, courts should exercise liberality in order to carry out the remedial purposes of the [Williams Act]. Excess information may well be harmless, but inadequate disclosure could be disastrous to the shareholder.

860 F.2d at 68 (Weis, J., dissenting). The more flexible, fact-based approach advocated by Judge Weis is consistent with our reading of the Williams Act.[5]

---

5. The appellant in *Interco* disavowed that Drexel was part of a "group," and the majority therefore declined to reach this issue. 860 F.2d at 65 n. 6. In view of our interpretation and application of the group concept, *infra*, our analysis may not ultimately contradict that of the Third Circuit.

The purpose of the Williams Act was explained by an often quoted report of the House Interstate and Foreign Commerce Committee as follows:

> The persons seeking control ... have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision.

H.R.Rep. No. 1711, 90th Cong., 2d Sess. 2, *reprinted in 1968 U.S.Code Cong. & Admin.News* 2811, 2813.

Section 14(d) of the Act governs the disclosures required of those initiating tender offers. Section 14(d)(1) bars an offer by

> any person, directly or indirectly ... if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless ... such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78n(d)(1). The statute then defines "person":

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for purposes of this subsection.

Williams Act § 14(d)(2), 15 U.S.C. § 78n(d)(2).

The SEC Rule, 14d–1(b)(1), 17 C.F.R. § 240.24d–1(b)(1), uses the word "bidder" in place of "person" in the statute. It defines a bidder as "any person who makes a tender offer or on whose behalf a tender offer is made." *Id.* The SEC, in a 1979 Release, stated that bidder was a "shorthand reference[ ] to [a] principal participant[ ] in a tender offer." Exchange Act Release No. 15,548 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,935, at 81,216 (Feb. 5, 1979). We read the "on whose behalf" language of Rule 14d–1(b)(1) to incorporate the "group" concept of sections 13(d) and 14(d) of the Williams Act. As pointed out by Judge Weis in *Interco*, the statute authorizes the SEC to require "additional information," but does not appear to grant the Commission discretion to narrow the definition of "person" explicitly defined in the Act.

Our interpretation of bidder under Rule 14d–1(b)(1) is consistent with the statute. Section 14(d) of the Act, as quoted *supra*, by explicit cross-reference incorporates the scope of the disclosure requirements of § 13(d), 15 U.S.C. § 78m(d). The definition of "person" in § 14(d)(2) is identical to the formulation found in § 13(d)(3). The legislative history of the latter section contradicts an exclusive focus on control, a factor provisionally raised in Schedule 14D–1, General Instruction G, Item 9, in determining who is a bidder under the regulation.[6] In discussing the identical definition of "person" in § 13(d)(3), the House Report explained:

> This provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they

---

**6.** The instruction provides:

> Where the bidder is other than a natural person and the bidder's financial condition is material to a decision by a security holder of the subject company whether to sell, tender or hold securities being sought in the tender offer, furnish current, adequate financial information concerning the bidder; *Provided,* That if the bidder is controlled by another entity which is not a natural person and has been formed for the purpose of making the tender offer, furnish current, adequate financial information concerning such parent.

17 C.F.R. § 240.14d–100.

agreed to act in concert.... This provision is designed to obtain full disclosure of the identity of any person or group [acquiring] securities by reason of any contract, understanding, relationship, agreement or other arrangement.

H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in 1968 U.S.Code Cong. & Admin.News* 2811, 2818. The group concept, centering on an agreement to act in concert, has been applied in the tender offer context. *See Riggs Nat'l Bank v. Allbritton,* 516 F.Supp. 164, 170–71 (D.D.C.1981); *Gray Drug Stores, Inc. v. Simmons,* 522 F.Supp. 961, 966–67 (N.D.Ohio 1981).[7]

We distill from these guides, which use the words "directly or indirectly," "on whose behalf," "principal participant[ ]," and "any contract, understanding, relationship, agreement or other arrangement" that there is no bright, hard-line test for bidder under the regulation. We empathize with the Third Circuit when it said in *Interco,* "[t]his is an area of law in which predictability is of crucial importance." 860 F.2d at 64. But we are skeptical. We suspect that any bright-line test, separating those who are subject to the Williams Act from those who are not, would merely invite the ingenuity of resourceful counsel to place their client formally on the desired side of the line, whatever the underlying reality may be.[8]

■ In this case we cannot say that, as a matter of law, an active advisor-broker-financier-participant who owns less than a majority interest in the surviving entity is not a bidder where, as here, there has been a history of close association, equity sharing, board representation and involvement from the beginning of the present offer, and where there is the possibility of the advisor-broker being the indispensable key to the offer's success. Nor can we say that while a 46 percent stockholder qualifies as a bidder, a 14 percent direct stockholder with other indirect equity interests cannot qualify.[9] At a minimum it is evident that Drexel has "act[ed] as a partnership, limited partnership, ... or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78n(d)(2). We are not convinced that the district court erred in determining that Prime demonstrated a likelihood of success on the merits, and therefore affirm the court's ruling that Drexel is a bidder.

This does not end our inquiry. We must determine whether the information still required by the court is "material."

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... [This standard] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that,

---

**7.** Our view that members of a § 14(d)(2) group are thereby bidders under Regulation 14D does not render Item 9's proviso moot. Item 9 does not address itself to the issue of who is a bidder. Rather, its addresses the issue of when a bidder's financial condition should be deemed "material." The most logical reading of the proviso is to establish a presumption of materiality regarding the financial condition of a controlling parent (to the extent that a bidder's own financial information is material), not to narrow the scope of disclosure mandated by the Act. *See Interco,* 860 F.2d at 69–70 (Weis, J., dissenting). Whatever deference may be due to the SEC in this area, we are not convinced that the SEC intended a narrow definition of bidder under its regulation.

**8.** There is a suggestion of this result in *Revlon, Inc. v. Pantry Pride, Inc.,* 621 F.Supp. 804, 814 (D.Del.1985). That case is distinguishable in any event on the basis that in the present case Drexel has participated, and has the option to participate further, in financing the tender offer through purchase of stock in Basic. Also, to the extent the *Revlon* court addressed the disclosure requirements under Rule 14d as applied to an individual, different standards might apply.

**9.** We recognize, too, the possibility that the prospect of Drexel becoming a major creditor by itself purchasing the junk bonds might, in light of all the circumstances, make its financial condition material for purposes of § 14(e) irrespective of the bidder issue. Prime has not pressed this argument, and we decline to reach it.

under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed. 2d 757 (1976).[10] In pointing out that materiality under Item 9 depends on the facts and circumstance of a given case, the SEC has explained:

> These may include, but are not limited to . . . (4) the ability of the bidder to pay for the securities sought in the tender offer and/or to repay any loans made by the bidder or its affiliates in connection with the tender offer or otherwise. It should be noted that the factors described above are not exclusive nor is it necessary that any or all such factors be present in order to trigger the materiality test.

Filing and Disclosure Relating to Tender Offers, Exchange Act Release No. 13,787, 42 Fed.Reg. at 38,346 (July 21, 1977).

It is not clear to us that the financial strength or vulnerability of Drexel, including the adverse impact of Drexel's plea bargain and other legal difficulties, is immaterial to Prime shareholders' deliberations. As opposed to the "highly confident" opinion of Drexel and the conclusory report that Drexel has over $2 billion of capital, and despite the argument that Drexel has recently financed far larger deals, the *Interco* submission indicated an equity of $1.4 billion as of June 24, 1988, *before* the $650 million plea bargain. As Judge Friendly put it:

> In applying [the materiality] test to a cash tender offer, it is necessary to appreciate the problem faced by a stockholder of the target company in deciding whether to tender, to sell or to hold part or all of his securities. It is true that, in the case of an "any and all" offer such as that here at issue, a stockholder who

has firmly decided to tender has no interest in the financial position of the offeror *other than its ability to pay* . . . since he will have severed all financial connections with the target.

*Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140, 1147 (2d Cir. 1979) (emphasis added). Even assuming the professed ability to pay the offered price,

> [T]he shareholder of the target company faces a hard problem in determining the most advantageous course of action, a problem whose difficulty is enhanced by his usual ignorance of the course other shareholders are adopting. If the bidder is in a flourishing financial condition, the stockholder might decide to hold his shares in the hope that, if the offer was only partially successful, the bidder might raise his bid after termination of the offer. . . . *Per contra,* a poor financial condition of the bidder might cause the shareholder to accept for fear that control of the company would pass into irresponsible hands.

*Id.* That shareholders might reasonably hold out for a higher offer is supported by the determination of the Delaware Chancery Court, rejecting Basic's challenge to the institution of takeover defenses by Prime directors, that the directors reasonably relied on independent investment bankers' valuation of Prime stock between $23 and $28 per share. *MAI Basic Four, Inc. v. Prime Computer,* No. 10428, slip op. at 11, 1988 WL 140221 (Del.Ch. Dec. 20, 1988). In turn, whether Drexel be seen as weak or strong is a legitimate datum for Prime stockholders.

■ Nor can we discount the possible impact of Drexel's plea bargain and other legal difficulties as immaterial. This area *of corporate cannibalism is not a neat and* tidy one. We must rely to a large extent on the judgment of the trial judge who

---

**10.** While in *TSC Industries* the Court dealt with materiality under Rule 14a–9 concerning proxy contests, this formulation has since been adopted for purposes of § 14(d), *see, e.g., Prudent Real Estate Trust v. Johncamp Realty, Inc.,*

599 F.2d 1140, 1146–47 (2d Cir.1979); *Koppers Co. v. American Express Co.,* 689 F.Supp. 1371, 1384 (W.D.Pa.1988)., and § 14(e), *Staffin v. Greenberg,* 672 F.2d 1196 (3d Cir.1982).

lives with the case. We have not hesitated to reverse in the past when we have deemed the judge to have been too protective of the target. But we shall defer when we are convinced that the judge has addressed all the interests in a thoughtful and fair manner. Such is the case here. Consequently, we defer to the district court's judgment that the kind of information voluntarily submitted in *Interco* is material in the present case.

This leads us to the issue of remedy. We see no reason, even though we have upheld the district court's decision that Drexel is to be considered a bidder, to require a full Schedule 14D–1 disclosure in the exercise of the court's equitable power. We agree with the court in *Pacific Realty Trust v. APC Investments, Inc.*, 685 F.2d 1083, 1086 (9th Cir.1982), that a curative disclosure is sufficient. *See also Riggs Nat'l Bank v. Allbritton*, 516 F.Supp. 164, 182 (D.D.C.1981).

We affirm the order of the district court. We further direct that if Basic files with the SEC[11] 1) current financial statements of Drexel, 2) identification of all Drexel-affiliated officers and directors, and 3) disclosure of recent trading in shares by Drexel, then the district court, upon determining that these disclosures appear accurate and reasonably equivalent to the information voluntarily disclosed in *Interco* (but brought up to date), shall vacate the injunction insofar as it is based on nondisclosure. *No costs.*

---

**11.** We leave it to the district court to determine whether and to what extent such additional dis- closures must be broadcast to target shareholders, in light of the additional costs involved.