**GEORGIA–PACIFIC CORPORATION, et al., Plaintiffs,**

v.

**GREAT NORTHERN NEKOOSA CORPORATION, et al., Defendants.**

**Civ. No. 89–0264 P.**

United States District Court, D. Maine.

Feb. 15, 1990.

See also 731 F.Supp. 38.

David A. Soley, Robert H. Stier, Jr., Bernstein, Shur, Sawyer & Nelson, Portland, Me., Stuart J. Baskin, Shearman & Sterling, New York City, for plaintiffs.

Robert A. Moore, Verrill & Dana, Portland, Me., Bernard W. Nussbaum, Wachtell, Lipton, Rosen & Katz, New York City, for defendants.

## MEMORANDUM AND ORDER DENYING DEFENDANTS' APPLICATION FOR A PRELIMINARY INJUNCTION

GENE CARTER, Chief Judge.

This action arises out of Georgia–Pacific's attempt to take over Great Northern Nekoosa Corporation by a cash tender offer commenced on October 31, 1989. In its complaint Georgia–Pacific seeks declaratory and injunctive relief against certain impediments to Georgia–Pacific's offer, which has been twice rejected by the Great Northern Board of Directors. Great Northern has filed a counterclaim alleging, *inter alia,* that Georgia–Pacific has violated Sections 14(d) and 14(e) of the Williams Act amendments to the Securities Exchange Act of 1934, and their accompanying rules and regulations, by making false statements concerning its plans to retain certain assets of Great Northern after the proposed takeover is consummated. At a shareholders' meeting, specially called for March 2, 1990, by Great Northern's directors in response to the call of the shareholders, Georgia–Pacific hopes to oust Great Northern's Board of Directors and to fill the vacancies thus created with its own candidates. On the grounds that Georgia–Pacific has violated the federal securities disclosure laws, Great Northern now seeks a preliminary injunction prohibiting any immediate further attempts by Georgia–Pacific to acquire Great Northern.

In this circuit, before granting preliminary injunctive relief, the Court must find

(1) that the [moving party] will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the [other party] (3) that [the moving party] has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Stanton by Stanton v. Brunswick School Department,* 577 F.Supp. 1560, 1567 (D.Me.1984). The burden of persuasion on these matters lies with the moving party. *Lovell v. Brennan,* 728 F.2d 560, 563 (1st Cir.1984). Having read the extensive written submissions on this motion and having heard the oral argument of counsel, the Court finds that Great Northern is not entitled to preliminary injunctive relief because it has not met its burden of showing that it is likely to succeed on the merits in this case.

The Court of Appeals for the First Circuit has recently addressed the criteria for the granting of a preliminary injunction in the context of violation of the Williams Act's disclosure requirements:

We are cognizant of the irreparable harm suffered by a takeover aspirant by any unjustifiable delay of consummation

of a tender offer. But we also value the utility of injunctive relief to prevent violations of disclosure requirements.... Thus, to the extent target shareholders may be deprived of material information required to be disclosed under the Williams Act before irrevocably tendering their shares, they will be irreparably harmed.

The interests in avoiding unnecessary delay in tender offers and in preventing violations of the Act being in a delicate balance, each in turn serving the public interest, we see the factor of likelihood of success on the merits as the critical one.

*Mai Basic Four, Inc. v. Prime Computer, Inc.*, 871 F.2d 212, 218 (1st Cir.1989). The factors being in essentially the same posture in this case, the Court will proceed to examine Great Northern's likelihood of success on the merits.

### Likelihood of Success

The Williams Act Amendments to the Securities Exchange Act were passed to "insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the ... intentions of the offering party." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). Section 14(d) of the Act provides that tender offerors must disclose certain information in the offer, request or invitation to tender. 15 U.S.C. § 78n(d). The regulations promulgated under section 14(d) specifically require that the bidder "[s]tate the purpose or purposes of the tender offer for the subject company's securities. Describe any plans or proposals which relate to or would result in: ... (b) A sale or transfer of a material amount of assets of the subject company or any of its subsidiaries." 17 C.F.R. § 240.14d–100, Item 5. Section 14(e) of the Williams Act further insures that the target shareholders will have adequate information by making it

unlawful ... to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders....

15 U.S.C. § 78n(e).

Georgia–Pacific's Offer to Purchase Great Northern which was filed with the SEC includes the following section, corresponding to the required Item 5.

Plans for the Company. Each of Parent and the Company are engaged principally in the forest products business and Parent intends to operate the Company in a manner consistent with its philosophy of investing for the long term. In connection with its consideration of the Offer, Parent has made a preliminary review, and will continue to review, various possible business strategies that it might consider in the event it acquires control of the Company. Based upon this preliminary review, Parent believes that significant operating efficiencies can be achieved by the combined entity. Other business strategies under review include the making of additional capital expenditures at the Company's facilities, a further review of the Company's and Parent's operations and the disposition of certain assets not essential for the combined entity's principal operations, and the reduction of selling, general and administrative and other expenses. If and to the extent Parent acquires control of the Company or otherwise obtains access to the books and records of the Company, Parent intends to conduct a detailed review of the Company and its assets, businesses, labor practices, operations, properties, dividend and other policies, corporate structure, capitalization and management and personnel and consider what, if any, changes Parent deems desirable in light of the circumstances which then exist.

Except as described in this Offer to Purchase, none of the Purchaser, Parent nor, to the best knowledge of the Purchaser and Parent, any of the persons

listed on Schedule I have any *present plans or proposals* that would relate to or result in an extraordinary corporate transaction such as a merger, reorganization or liquidation involving the Company or any of its subsidiaries *or a sale or other transfer of a material amount of assets of the Company or any of its subsidiaries....*

Soley Ex. 17, Georgia–Pacific's Offer to Purchase, at 30 (emphasis added).

Great Northern contends that Georgia–Pacific's representations, both in these offering documents and in other public statements, that it has no plans to sell Great Northern's assets, particularly the Maine assets, are blatantly false and, therefore, in violation of the Williams Act. As evidence of Georgia–Pacific's intention to sell the Great Northern assets, Great Northern points to a series of internal Georgia–Pacific studies concerning acquisition of Great Northern, studies done by an outside consultant on the same subject, and notes made by the consultant and bank employees that purport to represent the words of Georgia–Pacific officials concerning the disposition of assets in the event of consummation of a takeover of Great Northern by Georgia–Pacific. The Court is not persuaded that the evidence presented by Great Northern demonstrates that Georgia–Pacific intended to sell Great Northern assets at the time it made its offer or public statements denying such an intent and finds it insufficient to permit the Court to conclude that there is a likelihood that Great Northern could prove such to be the case at a trial on the merits.

### Georgia–Pacific Studies

The first documents presented by Great Northern are a series of internal studies performed by Georgia–Pacific to assess the possible acquisition of Great Northern Nekoosa. The 1984 study refers to one "[i]ntangible[ ] that might increase the value of this asset" as the "[o]pportunity and flexi-

bility to restructure Great Northern Nekoosa and Georgia–Pacific white paper organization and facilities to maximize profitability by improving winners and eliminating losers." Moore Ex. A. The underlying evaluation comparison shows the Maine mills, as well as others as having small or old machines and environmental problems and as requiring significant additional capital. *Id.* The same study was updated and presented again to Georgia–Pacific management in 1986 with no change in the above-cited portions. *Id.* Another 1986 memo by the author of the internal study, Carroll Tolar, refers to some of the disadvantages of Great Northern as relating to mills and timberlands in Maine. Moore Ex. B. Finally, Great Northern has presented another evaluation of Great Northern facilities performed by Mr. Tolar in 1988. Great Northern calls attention to Tolar's reference to "a gain from sale of assets of $1.9B after tax" and to his statement that "[t]he divestiture plan has been structured to reduce debt and strengthen existing business lines by eliminating problem facilities." Moore Ex. D. Great Northern argues that these documents show a pattern and set a historical context for the current debate by demonstrating that since 1984 Georgia–Pacific has consistently reached the "conclusion" that Great Northern's Maine assets should be sold.

The Court is not persuaded of anything by these documents other than that Georgia–Pacific has considered the acquisition of Great Northern since 1984, that it has evaluated Great Northern's assets in that regard, and that it has *considered* the possibility of divesting some of those assets if the acquisition were to take place.[1] The Court would expect no less from any large corporation considering a major acquisition. The documents do not show any conclusion, intent or plan concerning divestiture. In fact, the 1988 Tolar memo makes this very clear in language not highlighted by Great Northern's counsel: "The attached is a

---

1. Great Northern has also submitted a document prepared by Georgia–Pacific's Mr. Van Meter that refers in coded terms to Georgia–Pacific and Great Northern. The document provides figures for "Peachtree [Georgia–Pacific] Divestiture." Although offered as proof of Georgia–Pacific's continuing intent to divest, it proves nothing, for as Great Northern's counsel admitted at argument, it is impossible to tell to what assets the word divestiture refers.

first draft of an evaluation *for discussion purposes* ... A quick review of this information indicates that *a viable plan might be structured.*" Moore Ex. D.

*SPA Documents*

Great Northern argues that Georgia–Pacific's intention to sell Great Northern's assets is also shown by documents generated by the consulting firm, Strategic Planning Associates [SPA]. Georgia–Pacific hired SPA in May 1989 to provide mill cost and pricing projections for other companies in the industry. Soley Ex. 2, Correll Dep. at 15. Eugene Nesbeda of SPA called A.D. Correll of Georgia–Pacific to get his opinion on scenarios SPA should consider if Georgia–Pacific were to acquire Great Northern or other companies. Nesbeda's notes of that conversation include, under the heading GNN, "Keep industry gems at all costs," with a list of plant names. Under the same heading is a further notation, "Sell dawgs," followed by a list including "Maine mills" and "All the timberland." Moore Ex. H. Great Northern contends that these notes show that Correll and Georgia–Pacific intended to sell the Maine properties, which were considered undesirable. SPA subsequently prepared a huge number of documents for Georgia–Pacific. Among these were an "illustrative" chart positing a sale of Great Northern's "non-strategic businesses and facilities," including Millinocket and E. Millinocket. Moore Ex. J.

The Court is not persuaded that the SPA documents show an intent on the part of Georgia–Pacific to sell Great Northern's Maine assets. Since notes are by their very nature abbreviated and sometimes cryptic, an explanation of them is often helpful to the Court in determining their significance. Here, Mr. Nesbeda and Mr. Correll explained Nesbeda's notes in essentially the same terms. Nesbeda testified that the notes reflect the "starting point" for looking at the "options" available to Georgia–Pacific, and that Correll had pro-

vided "his sense of priority by facility of what would be the most attractive to Georgia–Pacific, what might be the least attractive and which facilities he had questions on." Moore Reply Ex. 20, Nesbeda Dep. at 39–40. Correll agreed that they had discussed the qualities of various facilities. He stated: "[A]s we talked about alternatives for the acquisition to be examined, we listed those facilities into categories of ones that would be critical to the acquisitions and ones we should examine whether they should be kept or sold." Soley Ex. 2, Correll Dep. at 20–21. Both Nesbeda and Correll indicated, therefore, that the notes represent the starting point for an analysis rather than any plan on the part of Georgia–Pacific.

Nesbeda, who no longer has any ties to SPA or Georgia–Pacific, testified categorically that he was never told by Georgia–Pacific of any plan to sell Great Northern's assets. Nesbeda Dep. at 167. He also stated that the illustrative chart, Moore Ex. J, while starting with ideas suggested by Correll in the earlier conversation, "represented a view that SPA held of opportunities of the industry and was not intended to reflect views of Georgia–Pacific management." Moore Reply Ex. 20, Nesbeda Dep. at 47. The testimony of Keith Miller of SPA reinforces the view that no plan or intent to divest should be inferred from the SPA documents. He testified specifically that at the end of the SPA study, Georgia–Pacific executives Correll and Van Meter said that "they would review the numbers with the investment bankers and that they had not reached a conclusion as to whether they should or should not acquire or divest anything." Moore Ex. W, Miller Dep. at 208. SPA recommended such further review. Soley Ex. 8, Miller Dep. at 225–227. On this record, the Court concludes that the SPA documents do not indicate Georgia–Pacific's plans to divest, but rather its intent to inquire into all possibilities before making a major investment.[2]

---

**2.** The fact that Georgia–Pacific executives may have found SPA's work interesting and intriguing and urged its completion, *see* Moore Ex. W., Miller Dep. 144–45, 206, is consonant with

the company's interest in getting as much information as possible. It does not indicate any affirmation of the idea of divestiture.

## Citibank Documents

Great Northern also urges the Court to find that notes made by Citibank employees are a "smoking gun," demonstrating "on their face that members of Georgia–Pacific management advised Citibank that Georgia–Pacific does have plans to divest substantial assets including the Great Northern mills in Maine." The record shows that Georgia–Pacific went to Citibank to secure financing for the acquisition of Great Northern. Citibank prepared a proposal that required asset sales to be incorporated into the financing deal's structure. Georgia–Pacific ultimately sought and obtained a financing package from the Bank of America that did not require asset sales. Citibank was allocated a $271 million loan as part of the total deal. Citibank Postmortem Analysis, at 5.[3]

The documents which Great Northern finds so telling are Citibank's Leveraged Capital Group's consultation memo concerning approval of senior debt facilities for Georgia–Pacific, the Citibank postmortem, and notes made by a Citibank employee at an early meeting between the two. The memo states that Georgia–Pacific did not want any commitment to sell assets built into the deal, "although the management stated that there were assets which they intended to sell post merger." Citibank wanted Georgia–Pacific to commit "to asset sales of at least $1,500 MM in the first two years of the deal," and thought that the asset sale program should begin immediately. The memo went on: "GP has already identified some of its existing assets which could be sold, and once the tender facility closes, should begin divesting GNN assets which are not required." The handwritten notes from the October 30 meeting have a heading "Van Me" under which is a subheading "Cash flow." A note under that section says, "Don't want to commit to divest, but they do plan to sell: ... Maine (Millinocket, E. Mil.)." The postmortem included the similar statement: "Although the company did describe certain asset sale opportunities in our first

meeting, they did not want to commit to any as a part of their tender strategy." Great Northern argues that these Citibank documents illustrate Georgia–Pacific's deceptiveness.

In affidavits three Citibank bankers deny categorically that Georgia–Pacific expressed plans to sell Great Northern's assets. The author of the Leveraged Capital memo states: "It is my recollection that GP consistently rejected the concept of mandatory asset sales." The affidavit further states that "the only assets GP ever said it had any intent to sell ... were GP assets. The statement that GP 'should begin divesting GNN assets which are not required' was Citibank's assessment at the time." Soley Ex. 29, Giles Aff. ¶ 9. The author of the handwritten notes, William Barnes, explains that during the discussion of cash flow someone asked what would happen if there was an extreme cash flow deficiency. "Van Meter responded that Georgia–Pacific did not intend to sell any assets, and would not commit to any divestitures that would foreclose its changing its mind upon further review, although Van Meter identified certain assets that could be sold in such an extreme case." These included the Millinocket mills. Soley Ex. 28, Barnes Aff. ¶ 4. Similarly, the author of the postmortem stated in his affidavit that when Citibank asked Georgia–Pacific to identify assets it might sell in the event that cash flow was worse than projected, Georgia–Pacific did so. However, it "did not accept the premise that asset sales would be necessary and, indeed, appeared offended when we suggested that asset divestiture might be used to amortize the debt more quickly ... I was under the impression that GP was refusing to commit to sell assets because it sincerely believed that such a step would not be necessary and wanted to maintain maximum flexibility in running its business." Soley Ex. 30, Newton Aff. ¶¶ 2, 3.

The Court is satisfied on the record as it now stands that the Citibank affiants have, in their affidavits, accurately represented

---

**3.** The Citibank documents are exhibits appended to Great Northern's Supplemental Memorandum in Support of Motion for a Preliminary Injunction.

the intent of Georgia–Pacific regarding asset sales as it was expressed at the meetings between them in October 1989. It is plain from all the Citibank documents and affidavits that Citibank attempted to force an asset divestiture plan on Georgia–Pacific. It seems highly likely, as suggested in the affidavits, that because Citibank thought asset sales were necessary, its officials pressed Georgia–Pacific representatives on the issue, extracting the admission from Van Meter that there were assets that could be sold if an unexpected financial downturn necessitated it. Although Barnes' notes do not refer to an extreme economic downturn as the impetus for the asset sales mentioned, the other two documents make clear that the cyclical nature of the industry and the possibility of a sudden downturn were discussed at the meeting at which Barnes made the notes, so his explanation seems to be a perfectly plausible amplification of his prior incomplete notes.

The Court is also satisfied that the affidavits accurately reflect Georgia–Pacific's intent because all the evidence indicates that Georgia–Pacific strongly resisted an asset sales plan as part of the financing package. It felt so strongly about the issue in fact that it decided to do business with Bank of America instead of Citibank. The Court sees no reason to accept Great Northern's hypothesis that Georgia–Pacific was adamant, only as a matter of show or deception, about a financing structure that did not entail divestiture. There is no evidence that would make that hypothesis likely,[4] and the unrebutted affidavits indicate that Georgia–Pacific was sincere in its expressed intent not to sell Great Northern assets.

*Bank of America Documents*

Great Northern also has submitted handwritten notes apparently written by Bank of America employees at meetings between that bank and personnel of Georgia–Pacific.[5] Two of the notes say virtually the same thing: "No asset sales assumption but probably would sell some assets." Moore Ex. P, at 10448; Moore Ex. Q, at 10342. The third note has a heading "Potent. asset sales" and includes in a list under that "(2) brownwood newsprint business." Moore Ex. R, at 9110. Rather than demonstrating to the Court a plan or intent on the part of Georgia–Pacific to sell specific Great Northern assets, these notes seem tentative and non-specific.

At his deposition, Mr. Francavilla, the head of the financing team for Bank of America, was asked whether he had any expectation that asset dispositions would take place or are a necessary part of the financing. He responded that asset sales are not a required part of the financing, but that as a matter of *his* business judgment, *he* would expect some type of dispositions in the ordinary course of business. Moore Ex. V., Francavilla Dep. at 170–71. He continued:

> What we were told by Georgia–Pacific is that they do not plan or have any intention on selling assets, but once a company this large operates for several years in the normal course of business you can expect some type of divestitures, whether they be very small or large and if you look at any companies on report, every year there is some minor sale or acquisition.

*Id.* Mr. Francavilla was very clear, in answer to repeated questions, that Georgia–Pacific never expressed any intention of disposing of pulp and paper mills in Maine or elsewhere upon completion of a merger

---

**4.** As discussed previously, on the record before it, the Court does not think that, by the time of its meetings with Citibank, Georgia–Pacific had reached any conclusion that it should sell Great Northern's Maine assets, but rather had been exploring all the possible financial scenarios for a possible acquisition. In fact, as will be discussed *infra*, on the current record the Court believes that by the time of the Citibank meetings, Georgia–Pacific had affirmatively decided

not to consider asset sales as part of its plan to acquire Great Northern.

**5.** The Court cannot tell from the evidence before it who the authors of the notes are. They appear to be written in different hands and they were marked as exhibits for the deposition of Charles Francavilla, a Bank of America employee. Moore Ex. P may be notes taken by Francavilla himself. *See* Soley Ex. 4, Francavilla Dep. at 168.

with Great Northern. Soley Ex. 4, Franca-
villa Dep. at 141–42. Mr. Ward, of Wasser-
stein–Perella, Georgia–Pacific's investment
banker, corroborates Francavilla's testimo-
ny concerning what Georgia–Pacific told
Bank of America: "That the company did
not want to sell assets, thought that all the
assets were productive and were producing
cash flow and that it could meet amortiza-
tion of the loan through cash flow and that
they were looking for a cash flow loan."
Moore Ex. Z, Ward Dep. at 59–60. Given
the testimony of Mr. Francavilla and Mr.
Ward, the Court is satisfied that the unex-
plained notes from Bank of America meet-
ings do not demonstrate that Georgia–Pa-
cific intended to sell Great Northern's as-
sets as part of its acquisition plan for Great
Northern.

### Conclusions

In *General Host Corporation v. Tri-
umph American, Inc.*, 359 F.Supp. 749,
754 (S.D.N.Y.1973), a case cited by Great
Northern, the court made clear that under
the Williams Act the tender offeror

> is not required to share with prospective
> tenderers every matter that was dis-
> cussed or considered in anticipation of
> making its offer. Any number of strate-
> gic fiscal and investment possibilities and
> combinations necessarily must be con-
> sidered in undertakings such as these
> where the aim is to achieve control of a
> major target company. Thus, there is
> nothing unusual about the fact that
> these exchanges occurred and ordinarily
> there would be no need to consider di-
> vulging them to shareholders.

This is the ordinary case. Great Northern
has demonstrated to the Court that Geor-
gia–Pacific considered various investment
possibilities and acquisition scenarios.
Great Northern's purported documentary
proof does not indicate that Georgia–Pacif-
ic has a plan of divestiture that is "highly
developed" and "ready for execution."
*Otis Elevator Co. v. United Technologies
Corp.*, 405 F.Supp. 960, 970 (S.D.N.Y.1975).
Rather, the Court finds the evidence in this
case more like that presented in *Missouri
Portland Cement Co. v. Cargill, Inc.*, 498
F.2d 851 (2d Cir.1974), where the target
company charged that there was an undis-

closed plan to alter its business and offered
a document exchanged between a consul-
tant and the offeror as evidence of the
offeror's intent. Judge Friendly found the
proof inadequate where there was "no evi-
dence that any such plan was developed,
much less adopted...." *Id.* at 872.

Not only has Great Northern failed to
meet its burden of showing that Georgia–
Pacific had a plan to divest Great Northern
assets which would make its SEC filings
and other public statements untrue, but
there is significant evidence suggesting
that Georgia–Pacific affirmatively decided
not to develop or adopt such a plan. *See
Otis Elevator*, 405 F.Supp. at 971. The
record shows that Wasserstein–Perella
sketched various financial scenarios for
Georgia–Pacific to present the financial im-
pact of an acquisition of Great Northern.
Some of the scenarios assumed asset dives-
titure and some did not. Moore Ex. Z,
Ward Dep. at 14. Having examined Was-
serstein–Perella's analyses, there is undis-
puted testimony that Georgia–Pacific's ex-
ecutives met sometime in the early fall and
decided that sale of Great Northern's as-
sets in the event of its acquisition did not
make economic sense. Soley Ex. 2, Correll
Dep. at 57; Soley Ex. 5, Hahn Dep. at 79–
80; Soley Ex. 14, Ward Dep. at 39. Mr.
Hahn, president of Georgia–Pacific, de-
scribed the reason for the decision not to
make divestments: "We simply looked at
the economic return of a model with divest-
ments and without divestments and the
economic return was higher without divest-
ments based on the assumed sales prices if
assets were sold." Soley Ex. 5, Hahn Dep.
at 80. The Court finds this undisputed
testimony concerning a decision made on
economic grounds late in the analysis phase
to be more indicative of Georgia–Pacific's
intent concerning asset divestiture than
notes made by people outside Georgia–Pa-
cific during the company's prolonged and
broad inquiry into possible acquisition
strategies and financing.

Although there is no document reflecting
the decision, the Court is satisfied that the
present record includes strong indicia that
Georgia–Pacific's testimony concerning its
non-divestment decision is credible. The
company's actions following the meeting at

which the decision was supposedly made are consonant with such a decision. First, the company told its investment bankers to stop considering asset sales in the analyses they were doing for Georgia–Pacific. Soley Ex. 14, Ward Dep. at 38–39. Then, as discussed above, upon seeking financing for the deal, Georgia–Pacific insisted on a package that did not require asset sales. Finally, the presentations made to Georgia–Pacific's board of directors concerning the acquisition of Great Northern did not assume asset dispositions. Soley Exs. 18, 19 and 20.

The Court has carefully examined Georgia–Pacific's 14D filings and its public statements and finds that on the record now before it, Great Northern has failed to meet its burden of showing that these items do not fairly and truthfully reflect what Georgia–Pacific's plans are with respect to Great Northern's assets. *See Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1085–86 (5th Cir. 1970). The Court finds, therefore, that Great Northern is unlikely to succeed on the merits of its counterclaim alleging violations of the Williams Act and that preliminary injunctive relief is not appropriate on the record made on the pending motion.[6]

Accordingly, it is *ORDERED* that Great Northern's Application for Preliminary Injunctive Relief be, and it is hereby, *DENIED*.

SO ORDERED.

---

**6.** Without deciding the issue, the Court notes that it also harbors some doubts about the materiality of information concerning post-merger divestiture of assets of the target corporation to shareholders of that corporation in an all cash tender offer such as that proposed here. As Judge Friendly noted in *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140, 1147 (2d Cir.1979) (emphasis added):

In applying [the materiality] test to a cash tender offer, it is necessary to appreciate the problem faced by a stockholder of the target company in deciding whether to tender, to sell or to hold part of all his securities. It is true that, in the case of an "any and all" offer such as that here at issue, *a stockholder who has firmly decided to tender* has no interest in

the financial position of the offeror other than its ability to pay ... since he will have severed all financial connections with the target.

*Accord, MAI Basic Four, Inc.,* 871 F.2d at 222. The Court has received an affidavit from a representative of a major shareholder affirming that divestiture of Great Northern's assets post-merger is of little importance to him in deciding whether to tender. If the Court were to decide that the issue of asset divestiture is not material to the shareholders in this situation, of course, no Williams Act violation could be made out and there would be a further ground for denying the injunctive relief sought by Great Northern.